UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LUBAVITCH OF OLD WESTBURY, INC. and
RABBI AARON KONIKOV,

                              Plaintiffs,

 - against -

INCORPORATED VILLAGE OF OLD WESTBURY,
NEW YORK; THE BOARD OF TRUSTEES OF THE
INCORPORATED VILLAGE OF OLD WESTBURY,
NEW YORK; MAYOR FRED CARILLO, in his official
capacity and individually; TRUSTEE HENRY
ALPERT, in his official capacity and individually;
TRUSTEE HARVEY BLAU, in his official capacity
and individually; TRUSTEE HARVEY SIMPSON, in
his official capacity and individually; TRUSTEE
MICHAEL WOLF, in his official capacity and
individually; TRUSTEE ELAINE GREENBERG, in
her official capacity; TRUSTEE STEVEN
GREENBERG, in his official capacity; TRUSTEE
CORY BAKER, in his official capacity and
individually; TRUSTEE JEFFREY K. BROWN, in his
official capacity; TRUSTEE MERINA CHIMERINE,
in her official capacity and individually; TRUSTEE
LESLIE FASTENBERG, in her official capacity;
TRUSTEE EDWARD NOVICK, in his official
capacity and individually; TRUSTEE ANDREW
WEINBERG, in his official capacity; TRUSTEE
MICHAEL MALATINO, in his official capacity as
Superintendent of Buildings and individually; THE
POLICE DEPARTMENT OF THE INCORPORATED
VILLAGE OF OLD WESTBURY, NEW YORK; AND
DOE INCORPORATED VILLAGE OF OLD
WESTBURY, NEW YORK POLICE OFFICERS 1
THROUGH 15,

                             Defendants.

------------------------------------------------------------------------X

**ORDER ADOPTING IN
PART REPORT AND
RECOMMENDATION**

2:08-cv-5081 (DRH) (ARL)

**HURLEY, Senior District Judge:**

# INTRODUCTION

Presently before the Court is the Report and Recommendation of Magistrate Judge Arlene R. Lindsay, dated July 7, 2021 (the "R&R") [DE 104], recommending that the Court (i) deny Plaintiffs Lubavitch of Old Westbury, Inc. and Rabbi Aaron Konikov's ("Plaintiffs") motion to amend their complaint and (ii) grant Defendants Village of Old Westbury, New York and the Board of Trustees of the Village of Old Westbury, New York's motion to strike the Declaration of Rabbi Aaron Konikov except as it relates to jurisdictional facts.

Plaintiffs filed objections to the R&R pursuant to Federal Rule of Civil Procedure ("FRCP") 72 on July 21, 2021, [DE 105] ("Obj."), to which Defendants responded on August 11, 2021, [DE 107] ("Obj. Resp."), and to which Plaintiffs replied on August 23, 2021, [DE 108] ("Obj. Reply").  For the reasons stated below, Plaintiffs' objections are sustained in part and overruled in part, the R&R is adopted in part, Plaintiffs' motion to amend is granted, Defendants' motion to strike is denied, and Defendants are granted leave to move to dismiss once the amended complaint is filed.

# BACKGROUND

The land-use claims in both the first Complaint, [DE 1] ("Initial Complaint" or "Initial Compl."), and the Proposed Second Amended Complaint, [DE 92-3] ("SAC"), involve facts spanning over twenty-five years, the last thirteen of which enmesh with this Court's oversight thereof.  The five new, additional claims introduced by SAC focus on events occurring in the last five years – events within the fabric of Defendants' allegedly broad scheme of anti-religious discrimination and not strictly

the land-use application process.  These threads lend themselves to the Background Section interweaving the merits with the procedure.

Ample use of subsection headings guide the reader, along with the following roadmap:  first, the parties and property at issue are identified; second, all the events, including those involving the Court, are recounted chronologically; third, the alleged financial consequences to Plaintiffs are summarized; fourth, the current procedural posture is laid out; fifth and finally, the differences between the SAC and the Initial Complaint are outlined.

The merits as alleged in the SAC are taken as true for the purposes of this Order.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

### A.    The Parties and The Property

Plaintiff Lubavitch of Old Westbury, Inc. is a religious corporation serving the Orthodox Jewish community in Old Westbury, New York with Plaintiff Rabbi Aaron Konikov ("Rabbi Konikov") as its emissary.  (SAC ¶¶ 1–2, 14, 78, 79, 120 [DE 92-3]). In 1999, Plaintiffs acquired a lot at 267 Glen Cove Road seeking to "develop a Temple, religious education, and related ancillary facilities for religious uses."  (*Id.* ¶¶ 11, 14, 57, 78, 79).  Since that time, Plaintiffs acquired three additional adjoining lots and, together with 267 Glen Cove Road, the four lots are roughly 7.15 acres in size.  (*Id.* ¶¶ 4–13).  Unless otherwise noted, the term "Property" refers to the four properties in the aggregate, despite Plaintiffs' acquisitions at different points in time, and the proposed development thereon.

Defendant the Incorporated Village of Old Westbury, Inc. (the "Village") is a municipal corporation governed by a Board of Trustees (the "Board") consisting of its mayor and four trustees. (*Id.* ¶¶ 85–87). The individuals filling these positions have changed with time. Defendant Mayor Fred Carillo is the present mayor and a former trustee. (*Id.* ¶ 88). Defendant Trustee Harvey Blau—deceased—is a former mayor and former trustee. (*Id.* ¶ 91). The following Defendants at some point also served as trustees: Henry Alpert, Michael Wolf, Steven Greenberg (deceased), Elaine Greenberg, Harvey Simpson, Cory Baker, Jeffrey K. Brown, Marina Chemerine, Leslie Fastenberg, Edward J. Novick, Christopher Sauvigne, and Andrew Weinberg. (*Id.* ¶¶ 93, 95, 98, 99, 101, 103–08). Defendant Michael Malatino advises the Board in his capacity as the Superintendent of Buildings and Public Works. (*Id.* ¶ 109). Each of the aforementioned individuals is sued both in his or her official capacity and individually – except Defendants Elaine Greenberg, Jeffrey K. Brown, Leslie Fastenberg, Christopher Sauvigne, and Andrew Weinberg, who are sued solely in his or her official capacity.

Defendant Police Department of the Village is the police force to which Defendants Police Officers 1 through 15 belong. (*Id.* ¶¶ 113–14).

## B.    1999–2007: Improper Religious Use, Property Purchased, POW Law, Dedication Ceremony, Tax-Exempt Status, Negotiations Begin

In January 1994, Rabbi Konikov rented a home at 1 The Pines, Old Westbury intending to offer his home for prayer services. (*Id.* ¶ 173). Defendants warned Rabbi Konikov that the Village prohibited religious use without a permit and, in September 1994, commenced proceedings to "enjoin [him] from inviting guests to [his] home for

prayer." (*Id.* ¶¶ 81–82, 174–75).  In May 1995, as a result of the Village's prosecution, Rabbi Konikov's landlord issued him a notice of intention to terminate the lease and directed him to vacate the premises.  (*Id.*).

Between 1998 and 1999, Plaintiffs determined that the Property at 267 Glen Cove Road would meet their needs to serve their Orthodox Jewish community.  (*Id.* ¶ 58).  Once purchased, Plaintiffs applied for building permits for the Property.  (*Id.* ¶ 60).  Their application was denied.  (*Id.*).

In June 1999, the Village began to consider a Place of Worship Law ("POW Law") applicable to religious land use applicants and imposed a land development moratorium.  (*Id.* ¶¶ 89, 149).  Defendants allegedly imposed the moratorium "to assess options and discourage what [Defendants] . . . knew were several pending and intended religious land development and use applications."  (*Id.* ¶ 150).  The Village adopted the POW Law and ended the moratorium in March 2001.  (*Id.* ¶ 62).  It requires properties to meet certain conditions before they can be put to, *inter alia*, religious use, *e.g.*, have a twelve-acre minimum lot size.  (*Id.* ¶¶ 64, 162).

In November 1999, notwithstanding their application's denial, Plaintiffs invited worshippers to a dedication ceremony at the Property.  (*Id.* ¶¶ 182–85).  The Village, as it did five years prior, issued a notice to Plaintiffs that the event would be an impermissible religious activity without a permit.  (*Id.*).  The SAC does not state whether Plaintiffs held the ceremony.  (*See id.*).

In April 2000, Plaintiffs received Nassau County tax-exempt status.  Because the Village allegedly "did not recognize" the status, it continued to direct property tax

notices to Plaintiffs.  (*Id.* ¶¶ 176–180).  Upon inquiry in July 2002, the Village alerted Plaintiffs that, regardless of their Nassau County tax-exempt status, they could not be exempt from the Village's property taxes without submitting an application directly to the Village.  (*Id.*).  The Village then reiterated its demand that Plaintiffs "satisfy [their] debts imposed by the Village."  (*Id.*).  Plaintiffs later applied for Village tax-exempt status in December 2002, which the Village granted in part and denied in part in March 2003.  (*Id.* ¶ 181).

Between 2001 and 2005, Plaintiffs "attempt[ed] to negotiate the material terms of religious land use and development on the" Property.  Since 2004—and continuing to the present—Plaintiffs have rented property in order to fulfill their religious mission.  (*Id.* ¶¶ 67, 221).  Following negotiations, Plaintiffs renewed their religious-use application in 2006; in December 2007, Defendants summarily denied the application due to noncompliance with the POW Law.  (*Id.* ¶¶ 68, 190).

### C.    2008–2009: Court Intervention, Administrative Hold

Plaintiffs commenced this action on December 17, 2008.  *See* Initial Compl. The parties nevertheless continued negotiations.  In the course thereof, on June 25, 2009, Defendant Carillo "conveyed" that Defendants would "pave the way toward issuance of a building permit for the [Property] as it then existed."  (*Id.*).  Allegedly, Defendants promised that if Plaintiffs followed Defendants' "directives, their religious land use application would be approved . . . without presentation to the Village Board of Zoning Appeals or any other Village Body" and instead would "be reviewed [solely] by the Board."  (*Id.* ¶¶ 191–94).

On July 31, 2009, the parties stipulated to the dismissal without prejudice of all claims against Defendants Carillo, Blau, Alpert, Wolf, and Simpson.  [DE 29]. They further stipulated, and then-presiding District Court Judge Thomas C. Platt ordered, that "the remaining claims in th[e] case be placed on administrative hold while Plaintiffs file a special use permit application . . . and until a determination is made" thereon.  [DE 30].

### D.    2009–2015: Further Negotiations

Between 2009 and 2015, the parties held several meetings at which Defendants "consistently assured Rabbi Konikov that if their discussions and negotiations" were fruitful, Defendants would promptly approve a special use permit. (SAC ¶¶ 195–98; *id.* ¶ 199 (listing meeting dates and attendees between 2013 and 2015)).  At these negotiations, Plaintiffs divulged their intention to add classroom space for religious education – which prompted Defendants to "repeatedly threaten[]" to classify the Property for educational use, which would implicate an additional set of provisions under the POW Law.  (*Id.* ¶ 158).  Plaintiffs also proposed building a Mikvah—a building for ritual cleansing, bathing, and purification, comprised of two submersion tubs, one for males and one for females—a facility Defendants "agreed" that Plaintiffs could "develop . . . 'as of right'" on the Property.  (*Id.* ¶¶ 54, 276–78, 293–94).

In this six-year interval, the parties filed five status reports upon the Court's demand.  [DEs 32, 35, 37, 38, 43].  Each details the progress made on Plaintiffs' application.  But on June 18, 2014, due to "delays in changing demands," Plaintiffs

requested a settlement conference with Judge Platt.  (*See* [DE 37]).  Defendants opposed, instead requesting Judge Platt to order the parties to meet and confer.  (*See* [DE 38]).

The matter was reassigned to the undersigned on July 8, 2014.  On July 9, 2014, Judge Lindsay ordered the parties to meet and confer.  [DE 41].  The administrative hold remained in place.

In "mid-2015," Defendant Carillo approached Rabbi Konikov to enlist his support in Defendant Andrew Weinberg's run-off election campaign.  (Decl. of Rabbi Aaron Konikov ¶ 19 ("Konikov Decl.") [DE 94-2]).[1]  Specifically, Plaintiffs were asked to endorse Weinberg, deliver absentee ballots, support Weinberg on social media, attend public events, and "send over [their] people to vote" for Weinberg.  (*Id.* ¶ 31).  In exchange, Plaintiffs "would receive the least intensive review possible under SEQRA, it would be completed in a year or less, and [Plaintiffs] would receive [their] permits."  (*Id.* ¶¶ 26–29).  But Rabbi Konikov declined, except that he advised his constituents, as he had done previously, that Weinberg's opponent (Defendant Leslie Fastenberg) "categorically opposed" Plaintiffs' plans and "would use her considerable influence to prevent" them from going forward.  (*Id.* ¶¶ 32–34).

---

[1]    These allegations are found not in the SAC, but in the Declaration of Rabbi Konikov submitted with Plaintiffs' reply brief to their motion to amend.  *See infra* Background Section K.  In their Objections, Plaintiffs "request leave to amend their Complaint to include the content of the" Konikov Declaration.  Obj. at 25 n.8. The Court construes the Konikov Declaration's averments as allegations in the SAC.  *See infra* Discussion Section I.

In November 2015, Defendants allegedly convinced Plaintiffs, through fraud, to re-submit to the Village an application with a "substantially reduced facility" on the Property. (SAC ¶¶ 200–02, 222–26). But when Plaintiffs did so on November 13, 2015, they were summarily rejected that same day because "no prior denial letter had issued." (*Id.* ¶¶ 200–01). To obtain a denial letter, Plaintiffs were instructed to return five days later, on November 18, 2015. (*Id.* ¶ 202). When they arrived on that date, however, Defendant Malatino advised Plaintiffs that "he was instructed by his superiors . . . to not issue the denial letter." (*Id.* ¶ 204). Indeed, due to a large turnover in Board members that year, Defendants viewed any prior discussions or negotiations with Plaintiffs "null and void." (*Id.* ¶¶ 206–08). "Plaintiffs were instructed on December 2, 2015 that they must . . . start their religious land use application from the beginning." (*Id.* ¶ 205).

### E.     The End of 2015 through the First Half of 2017: Motion Practice, Next Steps

Plaintiffs' next status report, dated December 3, 2015, again requested a settlement conference with the Court. [DE 43]. Defendants asked the Court either to continue the administrative hold or to grant them leave to move to dismiss. [DE 44]. Shortly thereafter, Plaintiffs advised the Court that they had not successfully applied for a special use permit, *i.e.*, the first step necessary to lift the administrative hold, given Defendants' failure to issue a denial letter. (*See* [DE 45]). Noting the lack of "any significant progress" made to that end, the Court set a briefing schedule for Defendants' motion to dismiss. (*See* Order dated Dec. 22, 2015). Under the Court's "bundle rule," the parties were to serve each other, but not file with the Court, their

opening and opposition papers and to file everything with the Court only when Defendants' reply was due.

With 2016 came Plaintiffs' filing for a special use application for the Property, which retaining the same "reduced facility" specifications in their November 2015 submission. (SAC ¶¶ 222–23). This 2016 application remains pending. (*Id.*).

On February 12, 2016, Plaintiffs filed a First Amended Complaint – an amendment coming more than seven years after the filing of the Initial Complaint. [DE 47] ("FAC"). Noting the absence of the Court's permission or their adversary's consent, the Court struck the FAC on February 17, 2016. (*See* Order dated Feb. 17, 2016). Plaintiffs advised that their filing complied with FRCP 15(a)(1)(B) by coming within twenty-one days of service of Defendants' opening motion to dismiss papers. [DE 49]. But Defendants responded that Plaintiffs nevertheless needed the Court's permission pursuant to FRCP 15(d) because the FAC detailed events occurring after the filing of the Initial Complaint. [DE 50].

Plaintiffs replied by requesting "additional time to file a formal Motion for Leave to File a Supplemental and Amended Complaint." [DE 51]. The Court set a briefing schedule thereon, while holding Defendants' motion to dismiss—still not filed with the Court—in abeyance. (*See* Order dated March 3, 2016). Upon review of Plaintiffs' Motion to Amend papers, the Court scheduled a March 16, 2017 conference "for the discrete purpose of determining what is necessary for the Plaintiffs to file their formal [special use permit] Application with the Defendants." [DE 58]. The

Court held Plaintiffs motion for leave to file the FAC in abeyance, where it remains. (*Id*.).

Following extension requests, the conference was held April 21, 2017. (*See* Minute Entry dated Apr. 21, 2017). The Court expressed its intention "not to see this get lost" considering that the case had "been in [a] state of flux where nothing actually happened for years." (Tr. at 15:24–16:1, Ex. B [DE 93-3] to Decl. of Peter T. Shapiro [DE 93] ("Apr. 21, 2017 Conf. Tr.")). During a recess, the parties agreed to a schedule in which they would exchange, between themselves, memoranda "identif[ying] deficiencies or purported deficiencies in the application materials" prior to a meeting addressing same. (*Id*. at 18:23–21:7). The Court asked to hear from the parties by May 18, 2017. (*Id*. at 22:9–15). At that May phone conference, "the parties reported they were communicating regarding [Defendants'] demands and that [the] process is ongoing." [DE 62]. Plaintiffs thereafter began to regularly submit joint status reports over the next three years.

### F.   Second Half of 2017: Police Search, Application Submission

The June 29, 2017 status report shared that the parties anticipated completing the necessary elements to Plaintiffs' application by the first week of July 2017. [DE 63]. The evening of the next day, June 30, 2017, Village Police Officers arrived at Rabbi Konikov's house and, without a warrant, "coerced [his wife] to permit them to search the home for a 'burglar.'" (SAC ¶ 47). The next status report, dated July 20, 2017, did not mention the "search" – nor did any subsequent status reports. The July

20 report did indicate, however, that Plaintiffs' application was not yet complete.  [DE 64].

Submission of the application finally occurred in mid-October 2017.  [DEs 65–68].  The Village Board conducted a public hearing on the application on December 18, 2017 and planned to continue same in January 2018.  [DE 68].

### G.    2018: Progress on the Application

At the January 2018 hearing, "[t]he Board directed Plaintiffs to amend the application and provide additional materials," scheduling another hearing for March 2018.  [DE 69].  But as Plaintiffs' "professionals work[ed] to revise the items requested," the anticipated hearing dated moved to April, then May, and then June. [DEs 70, 71, 72].

The parties' August 1, 2018 status report revealed that Plaintiffs' "engineers submitted all the requested materials" back on March 28, 2018, even though the previous status reports failed to say so.  [DE 73].  Despite initially "misplac[ing]" the submission, the Village remained in the process of "reviewing" it and anticipated issuing "additional follow-up questions."  (*Id.*).  As of that August 1st status letter, no questions were received and no further public hearing had been held.  (*Id.*).

On September 17, 2018, the Board instituted the State Environmental Quality Review Act ("SEQRA") process – a process which, upon a "positive declaration," would subject the Property to a heightened assessment of the proposed use and development.  ([DE 74]; SAC ¶ 31).  The SEQRA process progressed in November 2018 with the Board declaring itself the "Lead Agency" for the review.  [DE 75].

### H.      2019: Appearance Ticket, SEQRA, Police Stop, the Mikvah, Public Hearing

In February 2019, Defendant Malatino made an unannounced visit to the Property.  (SAC ¶¶ 258–59).  Upon inspection, Malatino decided to issue, but not yet serve, an Appearance Ticket due to an access road located on the Property's easement allegedly violating the Village building or zoning code.  (*Id.* ¶¶ 260–65).  Later that month—on February 20, 2019 after 9:00 PM—Village Police arrived with lights flashing, sirens sounding, full body armor equipped and firearms at the ready – simply to serve the Appearance Ticket.  (*Id.* ¶¶ 268–69).  Before proceeding with a formal hearing on the ticket, Defendants offered to dismiss the ticket if Plaintiffs would renounce the easement; Plaintiffs declined; and the matter went to trial.  (*Id.* ¶¶ 272–74).  Malatino testified at trial that he believed the access road involved religious use given Plaintiffs' pending land-use application.  (*Id.*).

At the next Board hearing—first scheduled for April 2019 but moved to July 2019—Defendants furthered the SEQRA process by issuing a "Positive Declaration." ([DEs 77, 78]; SAC ¶ 298).   The Positive Declaration requires "studies and assessments, with responses to later comments and revisions to revisions . . . adding additional years before a final determination within the Village's assessment scheme." (SAC ¶ 34).  "This is where Plaintiffs presently find themselves after more than twenty (20) years of attempting to obtain authority from Defendants to develop their [Property] in the Village for religious use." (*Id.* ¶ 35).

On the night of July 5, 2019—the Sabbath—Rabbi Konikov walked home from Cambria Heights, Queens – a distance of roughly eleven to twelve miles.  (*Id.* ¶¶ 238–

43).  Crossing into the Village, he stopped to rest briefly on the side of Glen Cove Road – where the Village Police recognized him, approached him, and asked him for identification.  (*Id.* ¶¶ 244–47).  Rabbi Konikov does not carry identification on the Sabbath.  (*Id.* ¶ 246).  After confirming his destination, the Police stated "they would not permit [him] to walk" home and attempted to force him into a patrol car.  (*Id.* ¶¶ 248–50).  Rabbi Konikov "passively resisted" because, on the Sabbath, he may not travel by motorized transport nor expose himself to electronic recording devices like police body cameras.  (*Id.* ¶¶ 246, 250–53).  Ultimately, Rabbi Konikov walked the rest of the way home and the Police followed in tow.  (*Id.* ¶ 254).

By August 1, 2019, Plaintiffs had submitted a Draft Environmental Impact Statement ("DEIS") pursuant to the positive SEQRA declaration.  [DE 79].  On August 5, 2019, the Court ordered the parties to "provide details as to what approvals or processes they need in the interim, and the relevant dates they expect them to happen," before the case could be dismissed.  (*See* Order dated Aug. 5, 2019).

That month, August 2019, the Village Police searched a residential home owned by Plaintiffs, allegedly "attempt[ing] to find and seize" evidence against Plaintiffs.  (SAC ¶ 47).

In late summer or early autumn 2019, Plaintiffs finally completed construction of their Mikvah.  (*Id.* ¶ 280).  Defendant Malatino had performed multiple inspections without comment on the Mikvah's construction, but when Plaintiffs requested a final inspection, he directed Plaintiffs "to plant landscape screening and install irrigation." (*Id.* ¶¶ 281–82).  Once done, Defendant Malatino again inspected the Mikvah and

gave his sign-off.  (*Id.* ¶¶ 283, 295).  Yet Defendants denied the Mikvah a certificate of occupancy in "late September or early October 2019," citing concerns related to "conform[ing] the premises to a place of public assembly or commercial code standard," the absence of the Fire Marshal's inspection, and accessibility requirements.  (*Id.* ¶ 287; Ex. 12 to *id.*).  Plaintiffs began making the appropriate changes.  (*Id.* ¶ 288).

At a September 16, 2019 hearing, Plaintiffs faced "insult[ing], disparag[ing], and demean[ing]" remarks against religious land-use applicants.  (*Id.* ¶ 49).  Defendant Carillo, in response to one concern about Jewish religious activity, allegedly grinned and remarked: "Do you know how long its going to take [for Plaintiff to get final approval]? . . . Trust me.  You don't have anything to worry about." (Konikov Decl. ¶¶ 36–37).  The meeting also raised several issues unaddressed by the DEIS, related *inter alia* to an easement and an adjacent parcel acquired in August 2018.  [DE 81].

The October 21, 2019 Joint Status Report notified the Court that Plaintiffs "ha[d] not yet finalized the 'Draft Scope' and revised site plan for the SEQRA review, the [DEIS] and for the Special Exception Permit."  (*Id.*).  The parties indicated it was "possible that there could be a decision on Plaintiffs' application by late-2020 if all of the necessary steps are taken."  (*Id.*).

## I.    **2020: Final Scope for the DEIS, Denial of Certificate of Occupancy**

Plaintiffs "submitted, and the [B]oard approved, the Final Scope for the" DEIS at a public meeting held on February 18, 2020.  [DE 82].  The Final Scope lists

twenty-two subjects to be addressed by Plaintiffs in the DEIS, some of which Plaintiffs allegedly covered in earlier submissions.  (SAC ¶¶ 299–300, 304).  The parties told the Court that, "[u]pon review of the DEIS as complete, the [Board] will continue to review, including appropriate public hearings."  [DE 82].

On March 2, 2020—despite Plaintiffs' attempts to address Defendants' requests to bring the Mikvah's into compliance—Defendants once again declined to issue a certificate of occupancy.  (*Id.* ¶¶ 290–91).  Defendants now construed the Mikvah as part of Plaintiffs' still-pending application for religious use.  (*Id.* ¶¶ 291–92; Ex. 13 to *id.*).

## J.   Financial Consequences of the Last Twenty-Plus Years

Plaintiffs attribute the following financial consequences to Defendants' actions over the past twenty-plus years: (i) $300,000 in professional fees (either cash or donated services); (ii) $15,000,000 in lost pledged donor commitments; (iii) $2,500,000 in unrealized gross donations and collections from ordinary religious use; (iv) $2,000,000 in "excess rental costs," consisting "in the aggregate" of lost building equity and location and religious programming disruptions"; and (v) $70,000 in costs to address Defendant Malatino's concerns with the Mikvah.  (SAC ¶¶ 217–21, 282).  Plaintiffs anticipate that the costs imposed by the SEQRA review "will approach or exceed $250,000."  (*Id.* ¶ 305).

## K.   Present Procedural Posture: Plaintiffs' Motion for Leave to File the SAC

On June 2, 2020, Plaintiffs filed a letter with Court requesting a pre-motion conference to (1) lift the administrative hold and (2) move for leave to file the SAC.

[DE 84].[2]  Defendants opposed, as the intended purpose of the administrative hold—to move Plaintiffs' application along—had been working, although "Plaintiffs ha[d] not yet submitted the DEIS which was expected in February or thereafter."  [DE 86].

On July 6, 2020, the Court "lifted the stay so that Plaintiffs can file a motion to amend the complaint" and ordered it to "be addressed to Magistrate Judge Lindsay." (*See* Order dated July 6, 2020).  When Plaintiffs filed their reply briefing with the Court, they included the Konikov Declaration, which Defendants moved to strike on October 2, 2020, [DE 96].  Plaintiffs claim the Declaration "buttresses the allegations in the" SAC, in large part through "supporting the propriety of the motion to amend."  (Obj. at 25).  As noted above, Plaintiffs nevertheless ask for leave to amend their pleading (again) to include the facts missing in the SAC that appear in the Konikov Declaration.  (*Id.* at 25 n.8).

Judge Lindsay issued her R&R on July 7, 2021, recommending the Court deny Plaintiffs' motion to amend and grant in part and deny in part Defendants' motion to strike.  [DE 104].  Plaintiffs objected on July 21, 2021, Defendants responded on August 11, 2021, and Plaintiffs replied on August 23, 2021.  [DEs 105, 107, 108].

---

[2]      While Plaintiffs moved for leave to file the FAC on May 26, 2016, [DE 55], the Court held its decision thereon in abeyance pending its efforts to obtain the parties' cooperation in addressing the deficiencies in Plaintiffs' application, [DE 58].  The SAC builds on the allegations in both the Initial Complaint and the FAC.

## L.      The SAC as Compared to the Initial Complaint

The SAC asserts seventeen causes of action, including twelve from the Initial

Complaint.[3]   As a short-hand, the Court refers to these common twelve as the

"Land-Use Claims."   Numbered in the same order as in the SAC, they are:

(1)      violation of the right to Free Exercise, 42 U.S.C. § 1983;

(2)      violation of the right to Free Speech and Free Association, 42 U.S.C. § 1983;

(3)      violation of the right to Freedom of Intimate Association and Freedom of Expressive Association, 42 U.S.C. § 1983;

(4)      violation of the right to Equal Protection, 42 U.S.C. § 1983;

(5)      violation of the right to Due Process, 42 U.S.C. § 1983;

(6)      substantial burden on religious exercise, Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc(a);

(7)      discrimination against an assembly or institution on the basis of religion, RLUIPA, 42 U.S.C. § 2000cc(b)(2);

(8)      imposition of a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, RLUIPA, 42 U.S.C. § 2000cc(b)(1);

(14)      civil conspiracy, 42 U.S.C. § 1985(3);

(15)      failure to prevent interference with civil rights, 42 U.S.C. § 1986;[4]

(16)      violation of rights under New York State Constitution Article I Sections 3, 8, 9, 11; and

---

[3]      Two claims, asserted in the Initial Complaint, are not re-asserted in the SAC and therefore not discussed in this Memorandum and Order.

[4]      As a consequence of the August 3, 2009 stipulation dismissing without prejudice all claims against the individual defendants named in the Initial Complaint, [DE 30], the § 1985(3) and § 1986 claims were dropped from the Initial Complaint, R&R at 2.  The SAC once again names these individuals as defendants and, accordingly, reasserts the § 1985(3) and § 1986 claims against them.  R&R at 7.

(17)    violation of New York Civil Rights Law ("NYCRL") § 40-c.

The SAC asserts five new causes of action, each stemming from events occurring in 2017, 2018, and 2019; namely, the Appearance Ticket prosecution, Plaintiffs' encounters with the police, and the denial of the Mikvah's certificate of occupancy.  The Court refers to these as the "New Claims."  Numbered accordingly, they are:

(9)     retaliation against the exercise of First, Fourth, and Fifth Amendment rights, 42 U.S.C. § 1983;

(10)    unconstitutional search and seizure in violation of the Fifth Amendment;

(11)    violation of Rabbi Konikov's rights under the Fourth and Fifth Amendments;

(12)    unauthorized search in violation of the Fourth Amendment; and

(13)    retaliatory fraudulent inducement in violation of RLUIPA and 42 U.S.C. § 1983.

The SAC re-adds the five individual defendants named in, but later dismissed without prejudice from, the Initial Complaint: Defendants Fred Carillo, Henry Alpert, Harvey Blau, Harvey Simpson, Michael Wolf.  R&R at 2–7; *see* [DE 30].  It also adds twelve new defendants.  The new defendants are: Steven Greenberg (deceased), Elaine Greenberg, Cory Baker, Jeffrey K. Brown, Marina Chemerine, Leslie Fastenberg, Edward J. Novick, Christopher Sauvigne, Andrew Weinberg, Michael Malatino, and the Police Department of the Incorporated Village of Old Westbury, New York, with their unidentified Police Officers 1 through 15.

## LEGAL STANDARD

The first issue disputed by the parties is the standard of review applied to the R&R's recommendations.  The applicable standard depends on whether Plaintiffs' motion to amend concerns (a) a non-dispositive pretrial matter, warranting this Court's review for clear error, or (b) a matter "dispositive of a claim or defense of a party," requiring *de novo* review.  *Compare* 28 U.S.C. § 636(b)(1)(A), *and* Fed. R. Civ. P. 72(a), *with* Fed. R. Civ. P. 72(b).  Defendants insist on the former, Obj. Resp. at 6–9; Plaintiffs, the latter, Obj. at 3; Obj. Reply at 5–8.

When this Court previously held "the weight of authority within th[e Second] Circuit classifies a motion to amend a complaint as a non-dispositive pre-trial motion" reviewed "under the clearly erroneous standard," *see Computer Assocs. Int'l v. Simple.com, Inc.*, 2006 WL 8441407, at *2 (E.D.N.Y. Sept. 30, 2006) (Hurley, J.), the Second Circuit had not yet decided two cases which the parties contend are decisive of the issue: *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) and *Jean-Laurent v. Wilkerson*, 461 Fed. App'x 18, 25 (2d Cir. 2012).  These cases, however, take diametrically opposing views and give the Court reason to doubt its previous assessment of the "weight" of authority.  A second look leaves the Court without a firm conviction as to whether clear error or *de novo* review applies.

The *Fielding* Court's precedential decision includes in dictum: "As a matter of case management, a district judge may refer nondispositive motions, *such as a motion to amend the complaint*, to a magistrate judge for decision without the parties' consent."  510 F.3d at 178 (emphasis added); *see also Kilcullen v. New York State*

*Dep't of Transp.*, 55 Fed. App'x 583 (2d Cir. 2003).   But in *Jean-Laurent*, a non-precedential summary decision, the Circuit held that denying Plaintiffs "leave to plead new claims" effectively "amount[s] to a ruling on a dispositive matter, something that exceeds a magistrate judge's authority under 28 U.S.C. § 636(b)(1)(A)."   461 Fed. App'x at 25.   As between conflicting dictum in precedent and a holding in a summary decision, neither is binding.   *Compare Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 508 (2d Cir. 1996) ("Dictum generally refers to an observation which appears in the opinion of a court which was unnecessary to the disposition of the case before it." (internal quotation marks omitted)), *with United States v. Ng Lap Seng,* 934 F.3d 110, 133 n.25 (2d Cir. 2019) ("[S]ummary decisions are non-precedential and, thus, cannot provide controlling limits on published rulings.")

The district courts are inconsistent in their practice.   To some, a motion to amend is "treated as a nondispositive matter" with "courts in this district . . . consistently appl[ying] the 'clearly erroneous' standard" of review on a magistrate's recommendation thereon.   *E.g.*, *Xie v. JPMorgan Chase Short-Term Disability Plan*, 2018 WL 501605, at *1 (S.D.N.Y. Jan. 19, 2018).   But others continue to "recognize[] some division in th[e Second C]ircuit on the issue of whether, and under what circumstances, motions to amend a pleading are dispositive or nondispositive."   *E.g.*, *Dorsainvil v. City of New York*, 2020 WL 6482348, at *3 (E.D.N.Y. Nov. 4, 2020) (internal quotation marks omitted).

Some "have suggested a bifurcated treatment of motions to amend: a magistrate judge's *denial* of a motion to amend a complaint should be treated as dispositive, while a *grant* of the same motion should be treated as non-dispositive." *Rivers v. New York City Hous. Auth.*, 2014 WL 12829494, at *2–4 (E.D.N.Y. Nov. 17, 2014) (emphases in original) (surveying the various approaches).  A subset of these courts take an even "more nuanced view" and construe a denial of a motion to amend "dispositive [only] *where the denial is based on futility*" – *i.e.*, where the amended complaint could not withstand a motion to dismiss under FRCP 12(b)(6), a dispositive motion.  *Id.* (emphasis in original); *e.g.*, *Pusey v. Delta Airlines, Inc.*, 2011 WL 1215081, at *1 (E.D.N.Y. Mar. 30, 2011).  The Second Circuit could be understood to endorse this nuanced view.  *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) ("When the denial of leave to amend is based on a legal interpretation, such as a determination that amendment would be futile, *a reviewing court* conducts a *de novo* review." (first emphasis added)).

The R&R recommends denying Plaintiffs leave to file the SAC on two bases. First, the R&R concluded that the amendments supporting the Land-Use Claims "would be futile, as the claims asserted therein are not ripe for adjudication," meaning the Court "lacks jurisdiction over" them.  *See* R&R at 18–31.[5]  Issues of jurisdictional

---

[5]      In an effort to avoid confusion surrounding the use of the term "futility" herein, the Court adopts the following convention:   "*Foman*-futility" shall refer to the standard used to assess whether a proposed amended complaint would survive a motion to dismiss. *Foman v. Davis*,.  371 U.S. 178, 182, 83 S Ct. 227, 9 L.Ed.2d 222 (1962) ("futility of amendment").  "*Murphy*-futility" shall refer to the exception(s) to the *Williamson* finality requirement to an as-applied land-use challenge's ripeness. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 349 (2d Cir. 2005) (discussing

significance warrant *de novo* review.  In *Williams v. Beemiller, Inc.*, for example, the Second Circuit held a district court erred in not reviewing *de novo* a magistrate's remand order, which "'determines the fundamental question of whether a case could proceed in a federal court,' [and therefore] is indistinguishable from a motion to dismiss the action from federal court based on a lack of subject matter jurisdiction for the purpose of [28 U.S.C.] § 636(b)(1)(A)."  527 F.3d 259, 266 (2d Cir. 2008) (internal citation omitted) (quoting *In re U.S. Healthcare*, 159 F.3d 142, 146 (3d Cir. 1998)).  Because the R&R and the parties characterize ripeness as concerning subject-matter jurisdiction,[6] the Court undertakes a *de novo* review of the issue.  *E.g.*, *Osborne v. Fernandez*, 2009 WL 884697, at *4 (S.D.N.Y. Mar. 31, 2009) (reviewing *de novo* a magistrate's recommendation to dismiss claims on ripeness grounds), *aff'd*, 414 Fed. App'x 350 (2d Cir. 2011).  Second, the R&R concluded the amendments relating to the New Claims "are separate and apart from" the Land-Use Claims and thus should not be heard in this case.  R&R at 32–34.  The Court need not determine whether the issue is dispositive or nondispositive.  As Plaintiffs have requested it, the Court will undertake a *de novo* review, the same standard applied to the Land-Use Claims.  The Supreme Court has held: "Any party that desires plenary consideration by the Article

---

*Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S. Ct. 3108, 87 L.Ed.2d 126 (1985) ("*Williamson*")).

[6]     While ripeness and subject-matter jurisdiction are technically two different doctrines, the distinction is academic in this case.  Precedential Second Circuit decisions have affirmed district courts' dismissals for lack of subject matter jurisdiction over unripe claims failing to meet the *Williamson* finality requirement. *E.g.*, *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118 (2d Cir. 2014); *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506 (2d Cir. 2014); *Islamic Cmty. Ctr. for Mid Westchester v. City of Yonkers Landmark Pres. Bd.*, 742 Fed. App'x 521 (2d Cir. 2018).

III judge of any issue need only ask." *Thomas v. Arn*, 474 U.S. 140, 154, 106 S. Ct. 466, 474, 88 L.Ed.2d 435 (1985).   The Federal Magistrates Act does not "does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Id.*

### DISCUSSION

The Court begins with the objections pertaining to (I) Defendants' motion to strike the Konikov Declaration.   Next is the ripeness of the Land-Use Claims' (II.A) facial challenges and (II.B) as-applied challenges.   After, the Court addresses (III.A) the propriety of adding the SAC's new factual allegations and New Claims, (III.B) the propriety of adding the allegations bolstering the Land-Use Claims, and (III.C) the undue delay, bad faith, and prejudice with leave to file the SAC.   The Court concludes with (III.D) *Foman*-futility.

### I.   Motion to Strike the Konikov Declaration

After Plaintiffs attached the Konikov Declaration to their reply memorandum on their motion to amend, Defendants moved to strike it or, in the alternative, for leave to file a sur-reply.   Defs. Mem. in Support of Mot. to Strike [DE 96-1].   As it related to the R&R's consideration of the merits, the R&R construed the reply memorandum as an opposition to a motion to dismiss and the Konikov Declaration as an improper attempt to "shore up a deficient complaint through extrinsic documents."   R&R at 18 (citing *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122–23 (S.D.N.Y. 2010)).   As to ripeness, however, the R&R viewed the reply memorandum "akin to [an opposition to] a motion under Rule

12(b)(1)"—*i.e.*, a motion premised on the absence of subject-matter jurisdiction—and considered the Konikov Declaration in its analysis.  *Id.*

Plaintiffs object that the Konikov Declaration "is evidence of" *Murphy*-futility and therefore "should be considered as buttressing the [SAC's] allegations."  Obj. at 24–25.  Defendants point out that the R&R "did consider the Konikov Declaration in deciding that Plaintiffs'" Land-Use Claims were not ripe pursuant to the *Murphy*-futility doctrine.  Obj. Resp. at 23.  The Court agrees with Defendants that the R&R considered the Konikov Declaration in assessing ripeness.  Plaintiffs' objection overruled.

In a footnote, "Plaintiffs request leave to amend [the SAC] to include the content of the" Konikov Declaration.  *Id.* at 25 n.8.  Defendants respond that deeming the Konikov Declaration's averments part of the Plaintiffs' SAC and permitting Plaintiffs to proceed thereon, twelve years "after the Initial Complaint was filed," would prejudice their defense.  Obj. Resp. at 25.

For purposes of this Memorandum and Order, the Court construes the statements in Konikov Declaration as if they were asserted in the SAC.  The allegations are therefore considered in analyzing the merits.  As the Second Circuit has held, "courts need not determine [*Foman*-]futility based only on an assessment of the proposed amendments—that is, the complaint presented to the court for its consideration.  Instead, courts deciding whether to grant leave to amend may consider all possible amendments when determining" the propriety thereof.  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 Fed. App'x 617, 622 (2d Cir. 2009) (citing

*Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 235 (2d Cir. 2007), with the parenthetical text: "directing the district court to consider 'whether the proposed amendment *or different amendments* to the complaint should be allowed'" (emphasis added by *Panther Partners*)).

Elsewhere in their response to Plaintiffs' objections, Defendants contend the propriety of granting leave to amend is restricted to the "four corners of the proposed pleading," quoting  this Court's Memorandum and Order in *Roman Catholic Diocese of Rockville Center v. Incorporated Village of Westbury*.  Obj. Resp. at 15 n.8 (quoting 2012 WL 1392365 (E.D.N.Y. Apr. 23, 2012) ("*Roman Catholic Diocese II*")).  The Court, however, did not issue so broad a statement.  Rather, the Court held it would not consider a factual assertion the defendants proffered in order to raise a defense in their memorandum opposing the plaintiff's motion to amend, whose proposed amended complaint did not include the subject assertion.  *See Roman Catholic Diocese II*, 2012 WL 1392365, at *7.  In support, the Court cited *Mahar v. U.S. Xpress Enterprises, Inc.* and added a quotation parenthetical with the language Defendants now erroneously attribute to this Court.  *Id.* (citing 2009 WL 2227583, at *1 (N.D.N.Y. July 21, 2009)).  That is, the context of the *Roman Catholic Diocese II* quote renders its point inapposite to this matter.

The Court therefore adopts the recommendation to consider the Konikov Declaration in the *Murphy*-futility ripeness analysis.  Plaintiffs' request to add the averments to its SAC is granted; they will therefore be considered in determining

whether the SAC can survive a FRCP 12(b)(6) motion.  *See infra* Discussion Section III.D.

## II.    Ripeness of the Land-Use Claims

The Court's *de novo* review reveals a fundamental defect in how the ripeness of Plaintiffs' Land-Use Claims has been addressed.  The R&R, guided by the parties' briefing, analyzes only *Murphy*-futility: whether Plaintiffs' pursuit of "a final, definitive position from a local authority to assess precisely how" they can use the Property would be futile.  R&R at 18–30 (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  This standard is appropriate to assess the ripeness of the as-applied challenges in Plaintiffs' Land-Use Claims.  *See infra* Discussion Section II.B.

But Plaintiffs' Land-Use Claims bring facial challenges as well – a fact Defendants do not dispute.  *E.g.*, Obj. at 15; Obj. Reply at 10–13; Defs. Opp. at 11–12 [DE 93].  Challenges to land-use laws and regulations on their face entail a different ripeness analysis.

### A.    Facial Challenges

A facial challenge to a law or ordinance "considers only the text of the [law or ordinance] itself, not its application to the particular circumstances of an individual." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).  Such claims "are generally ripe the moment the challenged regulation or [law] is passed." *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10, 117 S. Ct. 1659, 1666, 137 L.Ed.2d 980 (1997); *Islamic Cmty. Ctr. for Mid Westchester v. City of Yonkers Landmark Pres.*

*Bd.*, 258 F. Supp. 3d 405, 415 (S.D.N.Y. 2017) (observing that "facial challenges are

automatically ripe").  Indeed, the Second Circuit has held:

> [A] plaintiff alleging discrimination in the context of a land-use dispute
> is subject to the final-decision requirement unless he can show that he
> suffered some injury independent of the challenged land-use decision.
> Thus, for example, a plaintiff need not await a final decision to challenge
> a zoning policy that is discriminatory *on its face* or *the manipulation of*
> *a zoning process out of discriminatory animus* to avoid a final decision.
> In those cases, pursuit of a further administrative decision would do
> nothing to further define the injury, and the claim should not be subject
> to the application of the *Williamson* ripeness test.

*Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 123 (2d Cir. 2014)

(internal citations and quotation marks omitted) (emphasis added) (analyzing

*Williamson*, 473 U.S. 172); *see Charette v. Town of Oyster Bay*, 159 F.3d 749, 757 (2d

Cir. 1998) ("Charette ha[s] made no effort to apply for a permit for the Raven's Nest,"

which "does not, of course, deprive him of standing to assert that the Code is facially

invalid."); *e.g.*, *Cent. UTA of Monsey v. Vill. of Airmont, New York*, 2020 WL 377706,

at *9 (S.D.N.Y. Jan. 23, 2020) ("Plaintiffs' facial challenges to the Village's interim

land use development moratorium became ripe when the moratorium was passed on

February 8, 2017."); *Dean v. Town of Hempstead*, 163 F. Supp. 3d 59, 89 n.26

(E.D.N.Y. 2016) ("Plaintiffs' facial claims are not subject to the *Williamson* test and I

decline to dismiss them.").

The SAC attacks the POW Law as unconstitutional on its face and alleges

injury independent of Defendants' handling of Plaintiffs' land-use application.  *E.g.*,

SAC ¶¶ 26–43, 155–59, 312–13, 316–21.  To the extent Plaintiffs' Land-Use Claims

incorporate this facial challenge, and they all do, they are ripe.  *E.g.*, *Congregation*

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 595 & n.7,

599 (S.D.N.Y. 2013) ("*Tartikov*") (ripe challenges to zoning code on its face pursuant to "the Equal Protection Clauses of both the Federal Constitution and the New York Constitution, as well as the Free Speech, Free Exercise, and Free Association Clauses of the First Amendment of the Federal Constitution and corollary protections in the New York Constitution, and under RLUIPA," even though there was no final decision in the case); *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*, 2021 WL 1226930, at *12 (S.D.N.Y. Mar. 31, 2021) (ripe challenge to regulations on their face pursuant to RLUIPA "equal terms," despite no finality and the absence of a request for injunctive relief); *see Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164–66 (3d Cir. 2006) (ripe challenge to zoning ordinance on its face pursuant to substantive due process rights, without plaintiff seeking a variance or receiving a final decision).

The R&R correctly concluded that the ripeness of Plaintiffs' § 1985(3) and § 1986 conspiracy claims depends upon the same constitutional violations undergirding the § 1983 claims. R&R at 21 n.4 (citing *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 410 n.9 (E.D.N.Y. 2008) (Bianco, J.)); *see Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (observing a § 1985(3) claim revolves around a deprivation "of a right covered by the Constitution or other laws"); *Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a valid § 1985 claim . . . ."). For the same reason the § 1983 claims are ripe—*i.e.*, insofar as their facial challenges go—the civil conspiracy claims are ripe as well. *See Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992)

("[B]ecause Plaintiffs' due process challenge is ripe, their section 1985(3) claim alleging a conspiracy to deprive them of due process as guaranteed under the [F]ourteenth [A]mendment is also ripe for review.").

Accordingly, the Court declines to adopt the R&R's conclusion that Plaintiffs' failure to demonstrate *Murphy*-futility leaves the Court without jurisdiction over the SAC's Land-Use Claims, at least as far as they constitute a facial challenge to the POW Law and Defendants' zoning regulations.

### B.   As-Applied Challenges

The ripeness of as-applied challenges in a land-use dispute depends on whether a plaintiff, prior to commencing suit, "obtain[ed] a final, definitive position as to how [she] could use the property from the entity charged with implementing the zoning regulations." *Murphy*, 402 F.3d at 348 (citing *Williamson*, 473 U.S. at 186). The Second Circuit has characterized *Williamson*'s finality requirement as "a prudential rather than a jurisdictional rule" and has observed that, "in some instances, the rule should not apply and [that the court] still ha[s] the power to decide the case." *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) (internal quotation marks omitted); *see Leonard v. Plan. Bd. of the Town of Union Vale*, 659 Fed. App'x 35, 38 n.4 (2d Cir. 2016).

To avoid mechanical application of the "final decision" requirement, the Second Circuit recognizes a handful of exceptions. A property owner need not obtain a final decision from an appellate zoning board sitting "purely as a remedial body" empowered to "review," but not "participate," in the final-decisionmaking. *Murphy*,

402 F.3d at 349 (citing *Williamson*, 473 U.S. at 193). Nor must she engage a zoning board of appeals "lack[ing] discretion to grant variances." *Id.* Pursuit of finality is unnecessary when it is "futile": where a zoning authority "has dug in its heels and made clear that all [of the plaintiff's] applications will be denied." *Id.* Similarly, if a plaintiff demonstrates that the governmental authority "burden[s the] property by imposition of repetitive or unfair land use procedures in order to avoid a final decision," she is absolved from the finality requirement. *Sherman*, 752 F.3d at 562 (internal quotation marks omitted) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 621, 121 S. Ct. 2448, 150 L.Ed.2d 592 (2001)). While the latter "two exceptions to the finality requirement—[*Murphy*-]futility and unfair/repetitive procedures—are distinct concepts, . . . the analyses for the two are [sometimes] the same." *Id.* It is not easy to distinguish "merely frustrating" procedures from "unfair" or "futile" ones, but where "the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, the high standard [of these exceptions] is met." *Id.* A court may consider the "defendant's hostility, delay and obstruction" in evaluating *Murphy*-futility.[7] *545 Halsey Lane Props., LLC v. Town of Southampton*, 2015 WL 2213320, at *6 (E.D.N.Y. May 8, 2015).

   The R&R focuses on the *Murphy*-futility of Plaintiffs' Land-Use Claims given their "conce[ssion] that Defendants have not issued a final determination." R&R at 21 (citing Pls. Mem. at 3 [DE 92-1]). The R&R concluded: "[A]lthough the process has

---

[7]   As noted earlier, "*Murphy*-futility" is a catchall term for the exceptions to the *Williamson* finality requirement.

been ongoing for several years, progress has been made" per the status updates, Plaintiffs' allegations did "not satisfy the narrow futility exception to the finality requirement." R&R at 25–26. For that reason, the R&R recommended denying "Plaintiffs' motion to amend with respect to the" Land-Use Claims as "not ripe for adjudication," meaning the Court had no "jurisdiction over" them. *Id.* at 30–31. Plaintiffs object that the R&R overlooked Defendants' dishonest and unfair procedures. Obj. at 17–24.

The Court, after *de novo* review, concludes the facts here sufficiently invoke the same concerns animating *Sherman*'s application of the *Murphy*-futility exception. The land-use procedures Plaintiffs have endured are not just merely frustrating but unfair and unreasonable. The Court thus declines to adopt the R&R's recommendation and holds that Plaintiffs need not obtain a final decision before bringing their as-applied challenges in the Land-Use Claims.

The delay here well exceeds that in the cases cited in the R&R and by Defendants: Plaintiffs filed their first land-use application more than twenty years ago (in 1999) and filed a second application more than fifteen years ago (in 2006). SAC ¶¶ 60, 68. Many courts have noted that futility follows from "considerable" delay, often in reference to the non-dispositive eight-year delay in *Williamson*. *E.g.*, *545 Halsey Lane Props.*, 2015 WL 2213320, at *6. In *Sherman*, for example, the plaintiff sought approval for over a decade. 752 F.3d at 563. The twenty-year delay here, even attributing some portion thereof to Plaintiffs' conduct, easily clears the "considerable" bar.

Plaintiffs withstood a year-and-a-half moratorium, between 1999 and 2001, which impeded any progress on their development aspirations, SAC ¶¶ 61–62; the *Sherman* plaintiff endured a similarly-long moratorium, 752 F.3d at 558.  Yes, the *Sherman* moratorium "was specifically aimed at" the plaintiff's project. *Id.*  But the instant moratorium is sufficiently targeted too – the Village Planner allegedly testified it "was intended to be restrictive in its elements applicable to religious land use to discourage or dissuade religious land use applicants."  SAC ¶¶ 65, 150–52.

Just as the *Sherman* town "replac[ed] its officials" and hampered the plaintiff's efforts, 752 F.3d at 559, Plaintiffs here faced a similar alleged obstruction, SAC ¶¶ 206-08 ("The Village Board membership had changed dramatically earlier in 2015" and "with Deputy Mayor's Wolf's resignation from the Board, anything discussed between and among Plaintiffs, Deputy Mayor Wolf, and Defendant Malatino was 'null and void.'").  Both the *Sherman* plaintiff and Plaintiffs here were asked to repeat studies completed in the past. *Compare* 752 F.3d at 559, *with* SAC ¶¶ 303–04 (requiring "soils, vegetation and wildlife, groundwater, storm water collection" studies already completed by a property one-quarter mile away, as well as traffic studies "already submitted by the Village by" Plaintiffs).  Though Plaintiffs here may have avoided the threat of bankruptcy (unlike the *Sherman* plaintiff), they both spent millions of dollars in seeking their municipalities' approval. *Compare* 752 F.3d at 563 ("$5.5 million on top of the original $2.7 million purchase"), *with* SAC ¶¶ 215 221, 409 ($1.1 to purchase one of the lots in the Property, $2 million in excess rental costs inclusive of lost building equity, $1.2 million to "design, obtain approval,

and complete construction" of the Mikvah).  And Defendants' demand for payment of its consultant fees calls to mind that of the *Sherman* town.  *Compare* SAC ¶ 302, *with* 752 F.3d at 559.[8]

Defendants rightly point out that, unlike in *Sherman*, the Village's zoning regulations have not "changed in any material respect from the time of [Plaintiffs'] original 2001 application."  Obj. Resp. at 15.  The *Sherman* town did so "every time [the plaintiff] submitted or was about to submit a proposal, . . . sending Sherman back to the drawing board."  752 F.3d at 562.  Even if the Court ignores Plaintiffs' first application submitted in 1999, which preceded the Village's adoption of POW Law in 2001, Defendants' conduct achieved the same end.  Since 2001, the parties conducted multiple instances of years-long negotiations, culminating in Plaintiffs submitting an agreed-upon application, only to have Defendants deny it.  SAC ¶¶ 67–68 (negotiations between 2001 and 2005; Plaintiffs' 2006 application denied in 2007); *id.* ¶¶ 96–97, 193–205 (negotiations between 2009 and 2015; Plaintiffs' 2015 application denied same day and instructed "to start their religious land use application from the beginning").  Defendants' alleged actions indeed sent Plaintiffs back to the drawing board on several occasions.

Further indicia supporting the Court's conclusion include the allegations of open hostility, SAC ¶ 49; Konikov Decl. ¶¶ 36–37, malicious intent and bad faith in negotiations, SAC ¶¶ 191–216, bait-and-switch tactics relating to the Mikvah's

---

[8]   The Court will not compare *Sherman*'s $65,000 in fees with the $250,000 alleged by the Plaintiffs because the latter figure combines both Plaintiffs' and Defendants' fees.  *See* SAC ¶ 305.

certificate of occupancy, *id.* ¶¶ 54–55, 275–297, and retaliation for Plaintiffs' refusal to support Defendant Weinberg's election campaign, Konikov Decl. ¶¶ 19–34, 36–37. To be clear, the Court agrees with the R&R that none of these elements alone warrant an exception to the finality requirement. *E.g.*, *Kowalczyk v. Barbarite*, 2012 WL 4490733, at *9 (S.D.N.Y. Sept. 25, 2012) ("Hostility *alone*, while perhaps unjustifiable, does not make certain that a zoning variance would be opposed or rejected" (emphasis added)); *Country View Ests. @ Ridge LLC v. Town of Brookhaven*, 452 F. Supp. 2d 142, 154 (E.D.N.Y. 2006) (holding allegations of "malicious intent and bad faith . . . in order to delay and obstruct" land-use application *"without more is insufficient* to establish" futility (emphasis added)).

This Court respectfully disagrees that Plaintiffs must demonstrate "the inevitability of [Defendants'] refusal" of their application." R&R at 21–25 (quoting *Tartikov*, 915 F. Supp. 2d at 601, 605–606 and *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y. 2000)). This language originates in First Circuit precedent, on which the *Goldfine* Court had to rely because the Second Circuit "ha[d] not yet delineated the precise contours of the futility exception." 80 F. Supp. 2d at 159 ("[T]he First Circuit has noted that 'a sort of inevitability is required: the prospect of refusal must be certain.'" (quoting *Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991))). Yes, *Murphy* employs comparable language. *See* 402 F.3d at 349 (requiring a zoning to have "made clear that all such applications will be denied"). But in *Sherman*, the Second Circuit brought the exceptions to the finality requirement into sharper focus. In particular, it rejected the view that plaintiffs challenging the entirety of a land-use

application process as "unfair and repetitive" must establish an inevitable denial—viz. an "all but certain" brick wall awaiting their application at the end of the process. 752 F.3d at 561–63 (quoting the district court's decision on review). That type of challenge is what Plaintiffs' Land-Use Claims bring. Obj. at 23 ("Defendants' process is not honest, nor is it objective.").

As a consequence, then, the "progress [that] has been made" does not sway the Court. *See* R&R at 26. The *Sherman* plaintiff too made "progress." He made it far into a DEIS, like Plaintiffs, only for the municipality to impose further onerous requirements. *Compare* [DEs 81, 82], *and* SAC ¶¶ 300, 306, *with* 752 F.3d at 558–59. These situations differ meaningfully from the one analyzed by this Court in *Roman Catholic Diocese of Rockville Center v. Incorporated Village of Old Westbury*, 2011 WL 666252, at *18 (E.D.N.Y. Feb. 14, 2011) ("*Roman Catholic Diocese I*"). Here, the Court is not saying "a municipality's requirement of an [Environmental Impact Statement] (and the often lengthy process that follows) constitutes *sufficient[]* delay as to invoke the futility exception." *Id.* (emphasis added). Rather, the prospect of that delay, appended to one already twenty-years long, can factor into the decision to relieve Plaintiffs of their need for a final decision.

Plaintiffs do not contend any one allegation *in isolation* supports futility. Obj. at 23 ("The [SAC] does not allege [hostility] in isolation, as the R&R suggests."). Defendants' allegedly unfair and repetitive procedures inflicted a "death by a thousand cuts" which motivates the Court "to consider the entirety of the government entity's conduct, not just a slice of it." *Cf. Sherman*, 752 F.3d at 566. As alleged,

Defendants "manipulated [the land-use application] process out of discriminatory animus to avoid a final decision," *Sunrise Detox*, 769 F.3d at 123, specifically against Orthodox Jews and other religious land-use applicants in Old Westbury. *E.g.*, SAC ¶¶ 15–20, 188, 312, 379; Initial Comp. ¶ 5.F(alleging "discriminat[ion] against the Hasidic Jewish community in general and the Plaintiffs' proposed religious land use in particular.").

The Court has endeavored to avoid a rote application of the finality requirement. *See Murphy*, 402 F.3d at 349.  Proceeding with the suit does not "inhibit the kind of give-and-take negotiation that often resolves land use problems"—because Defendants have on two occasions "repudiated" any such seeming gains "at the last minute," Obj. at 21–22—nor would it "impair or truncate a process" running its course for the last twenty years, *see Sunrise Detox*, 769 F.3d at 124.

The Court is "mindful of the general proscription that federal courts should not become zoning boards of appeal to review nonconstitutional land-use determinations." *Zahra v. Town of Southold*, 48 F.3d 674, 679 (2d Cir. 1995).  But, under the circumstances alleged, a final decision is not necessary to evaluate the saga of Plaintiffs' land-use application, *Sherman*, 752 F.3d at 563.  Their as-applied Land-Use Claims are ripe.

## III.    Supplemental Allegations and New Claims

The R&R correctly observed that the allegations implicate FRCP 15(a), 15(d), and 21. R&R at 14–15.  FRCP 15(a) "permits assertion of matters that were either overlooked or unknown at the time of the original pleading," FRCP 15(d) "enables a

party to set forth in a supplemental pleading events that have happened since the date of the original pleading," and FRCP 21 concerns amendments "add[ing] new parties." *Id.* (internal quotation marks omitted). All three warrant "the same standard of liberality afforded to motions to amend pleadings under Rule 15," *id.* (quoting *Addison v. Reitman Blactop, Inc.*, 283 F.R.D. 74, 79 (E.D.N.Y. 2011)), except that supplemental allegations and claims brought under FRCP 15(d) should "connect [] to the original pleading," *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). "Leave is normally granted, especially when the opposing party is not prejudiced by the supplemental pleading," *id.*, but, beyond prejudice, a Court should consider "undue delay, bad faith, [and *Foman-*]futility," *Addison*, 283 F.R.D. at 79.

Plaintiffs' SAC adds allegations in further support of the Land-Use Claims and lays the foundational allegations to its New Claims. The Court's analysis starts with the R&R's recommendation as to adding the (A) New Claims and allegations in support and (B) new allegations bolstering the Land-Use Claims. *See* R&R at 31–34. Declining to adopt the recommendation on both, the Court next examines the (C) undue delay, bad faith, and prejudice factors. The final subsection identifies the need for full briefing on (D) *Foman-*futility, *i.e.*, whether the SAC "would fail . . . to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

## A.     The New Claims and Supplemental Allegations in Support

The New Claims arise out of events in 2017, 2018, and 2019 and consist of retaliation, unlawful searches and seizures, and retaliatory fraudulent inducement. R&R at 32–33.  By contrast, the R&R described the Land-Use Claims as revolving around Defendants' "enactment and application of the POW Law" to stymie Plaintiffs' religious land use.  *Id*.  The R&R recommended denying Plaintiffs' addition of the New Claims and supporting allegations:  "Plaintiffs' factual allegations concerning the unconstitutional stops, unlawful searches," and fraud relating to the Mikvah's construction "do not merely amplify or support" the Land-Use Claims but instead "present [] entirely new claim[s] for relief based upon facts not included" in the Initial Complaint.  *Id*.  Concludes the R&R: while they "may implicate protected religious free exercise[,] that does not mean that the Initial Complaint provided Defendants with adequate notice of" the New Claims.  *Id*.

On a FRCP 15(d) motion to supplement, "the threshold consideration . . . is whether the supplemental facts connect the supplemental pleading to the original pleading."  *In re Elysium Health-ChromaDex Litig.*, 2021 WL 194994, at *4 (S.D.N.Y. Jan. 19, 2021).  In Plaintiffs' view, the New Claims and allegations pled in support "each involve an element of attempted, protected religious Free Exercise, or its pursuit."  Obj. at 9–15.  They therefore connect to the Land-Use Claims because the latter are "[i]ntertwined inextricably" with Defendants' "anti-religious discrimination and animus" against Orthodox Hasidic Jews.  *Id*.

The Court agrees.  Paragraph 4 of the Initial Complaint reveals the theory of Plaintiffs' case:  Defendants allegedly "burden[ed] Plaintiffs' religious exercise" and "targeted Plaintiffs' religious use" as a "direct result of [their] opposition to Plaintiff's religious sect," Orthodox Hasidic Judaism.  Initial Compl. ¶ 4; ¶ 52 ("This targeting has been based in large part on anti-Hasidic animus.").  Defendants allegedly "discriminat[ed] against the Hasidic Jewish community *in general* and the Plaintiffs' proposed religious land use *in particular*."  *Id.* ¶ 5.F (emphasis added).  The animus has manifested outside of Defendants' land-use procedure.  *E.g.*, Initial Compl. ¶ 55 (taxation); FAC ¶ 107 (direct statements from Board member); SAC ¶¶ 248, 252, 268.

Defendants distill the FRCP 15(d) case law to permit supplemental causes of action and allegations in support if they involve the same type of harm (personal vs. property), arise under the same statute, involve "the same or substantially the same defendants," and come "within one to three years" of the original pleading.  Obj. Resp. at 23.  They accurately capture the essence of the several employment discrimination cases on which Plaintiffs rely.  But this action compares better with *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S. Ct. 1226, 12 L.Ed.2d 256 (1964).  There, the Supreme Court held a district court should have granted leave to file an amended supplemental complaint that "presented a new and different cause of action from that presented in the original complaint," "add[ed] new parties[,] and rel[ied] in good part on transactions, occurrences, and events which had happened since the action had begun."  *Id.* at 226–27.  The *Griffin* plaintiff originally "challenged racial segregation in [county] schools which were admittedly public," but

when the county "clos[ed] down [its] public schools," he redirected his challenge to segregated private schools receiving state funds.  *Id.* at 221, 226–27.  The Court held the amended supplemental complaint

> ar[ose] out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people . . . .  Rule 15(d) of the Federal Rules of Civil Procedure plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary.  Such amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice.

*Id.*[9]

As noted by Judge Lindsay, "the test is whether the new allegations relate to the original pleading, not if the specifics match."  R&R at 32–33.  If the *Griffin* complaints were sufficiently related—because they battled race discrimination in the county's education system, despite subsequent events shifting how the animus revealed itself—then so are Plaintiffs' complaints here.  Plaintiffs' Initial Complaint and FAC put Defendants on notice of "a pattern of religious discrimination directed at the Jewish people," including "act[ions] under color of law [to] conspire[]" against them.  Initial Compl. ¶ 52, *id.* ¶¶ 122–35 (civil conspiracy causes of action).  The Court cannot fault the Initial Complaint for present purposes for failing to give "adequate notice" of "factual allegations concerning the unconstitutional stops, unlawful searches, and construction of the Mikvah"—*e.g.*, actions "against the person of [Rabbi]

---

[9]     The *Griffin* Court came to its decision due in part to the defendants' attempt to circumvent a court order – conduct of which this Court does not accuse Defendants here.  *See* 377 U.S. 218.  Nevertheless, *Griffin* is instructive for its analysis as to whether supplemental allegations sufficiently relate to a previous pleading.

Konikov or his family"—when that alleged harassment first transpired some ten years thereafter. *See* R&R at 32–33. Just as in *Griffin*, that the alleged discrimination manifests in a new form, presenting new avenues for relief, does not compel the Court to deny the motion to amend.

True, Plaintiffs plead that "[m]any of th[e] acts and omissions toward Rabbi Konikov and the claims arising from them are distinct in their genesis and effects, including temporally, and stand independently from religious land use claims and federal civil rights claims." SAC ¶ 17. But in their next breath, they allege: "The Defendants' acts toward the Lubavitch, and toward Rabbi Konikov and his family . . . are consistent with [Defendants'] actionable conduct for more than twenty-five (25) years toward others attempting to initiate and pursue religious land use within the Village, including harmless Free Exercise." *Id.* ¶ 20. The Court understands the former quote to say Plaintiffs can bring the New Claims as a separate "action . . . [in] this Court or another in this courthouse," Obj. at 15, a fact that Defendants do not dispute, Obj. Resp. at 8 ("Nor does the [R&R] preclude any claims since, as Plaintiffs acknowledge, they can file a separate action asserting the claims based on the alleged 2017–2019 conduct."). "No purpose would be served by obliging [P]laintiffs to commence a separate lawsuit and move to consolidate, whereas allowing supplementation will permit the entire controversy to be litigated as a unit on the merits." *Corum v. Beth Israel Med. Ctr.*, 359 F. Supp. 909, 913–14 (S.D.N.Y. 1973) ("This is merely to say that the thrust of the complaint as a whole is . . . to require

them to provide more services for the poor.  It should not be broken into parts to be considered in isolation from each other . . . .").

The New Claims and allegations in support therefore sufficiently relate to the Initial Complaint.

### B.   Supplemental Allegations to the Land-Use Claims

The R&R recommended the Court reject Plaintiffs' amendments "enhanc[ing] the claims relating to the constitutionality of the POW Law," viz. the Land-Use Claims, because "the Court lacks jurisdiction over those claims."  R&R at 31.  The Land-Use Claims are ripe, however, and the Court has jurisdiction.   This recommendation is not adopted.  *See supra* Discussion Section II.

### C.   Undue Delay, Bad Faith, and Prejudice

The R&R did not reach the issues of undue delay, bad faith, or prejudice.  R&R at 34, 35 n.6.  The Court therefore decides the issue according to arguments presented in the underlying motion to amend papers.

Delay, bad faith, and prejudice work in tandem when it comes to the propriety of granting leave to amend.  *Barrows v. Forest Labs., Inc.*, 742 F.2d 54, 58 (2d Cir. 1984) ("[C]onsiderations of undue delay, bad faith, and prejudice to the opposing party" are the "touchstones of a district court's discretionary authority to deny leave to amend . . . ."); *see State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").  For example, "the longer the period of an unexplained delay, the less will be required of the

nonmoving party in terms of a showing of prejudice." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (internal quotation marks omitted) (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)).   Prejudice to the nonmovant nonetheless is the "most important" factor. *Id.* An "[a]mendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (internal quotation marks omitted).

The SAC is not sufficiently prejudicial to Defendants to warrant the denial of Plaintiffs' motion.   Notwithstanding its age, this case remains at the pleadings stage. Discovery has not begun, nor has a scheduling order setting its deadlines been entered.   The Second Circuit recently issued a nonprecedential decision which noted the absence of sufficient "prejudice resulting from [a] delay" in amending a complaint where "discovery had not begun." *Schvimmer v. Off. of Ct. Admin.*, 857 Fed. App'x 668, 673 (2d Cir. 2021); *Pall Corp. v. Entegris, Inc.*, 2007 WL 9709768, at *1 (E.D.N.Y. May 25, 2007) (Bianco, J.) (finding insufficient prejudice where "fact discovery was not complete, expert discovery had not yet begun, and no summary judgment motion had been filed").

The Court is not persuaded by Defendants' assertion that the SAC will unduly prejudice them by "significantly delay[ing] the resolution of the dispute" given the "motions and discovery to be undertaken." Defs. Opp. at 23.   That position is hard to

reconcile with their earlier requests, on August 3, 2009 and April 21, 2017, to stay the action to enable the land-use application process to "proceed without any [further] litigation" – which, in turn, delayed such motion practice and discovery. *E.g.*, Apr. 21, 2017 Conf. Tr. at 7:25 [DE 29]. It is harder to reconcile with Defendants' current request to "continue the stay." Obj. Resp. at 1; Defs. Opp. at 23. The stay has no foreseeable end date, whereas "the sooner there is a trial on the merits, the more quickly will [the Court and the parties] be relieved of [any] uncertainty." *Middle Atl. Utils. Co. v. S. M. W. Dev. Corp.*, 392 F.2d 380, 386 (2d Cir. 1968). At present, Defendants have not yet filed any Answer and "the administrative hold [has] precluded the[] pursuit of discovery." Pls. Mem. at 3. It remains to be seen whether litigating case "will take far longer than completing the application process." Defs. Opp. at 23. The parties are reminded that nothing in this Memorandum and Order prevents them from completing the land-use application process while the case is pending.

Despite Defendants' contention otherwise, *Sank v. City University of New York* is not instructive here. Defs. Opp. at 22–23 (analyzing *Sank*, 112 Fed. App'x 761 (2d Cir. 2004)). The *Sank* plaintiff sought to add retaliation claims "eight to eleven years after" the retaliatory acts occurred, and he did so "late in the litigation" – namely, after the court had held a six-day bench trial. *Id.* at 764. By contrast, Plaintiffs' motion to amend is premised upon events occurring three years ago and trial is far off. *E.g.*, *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block--Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir. 1979) ("[E]ven if Chemical's estimate that it would need

several months to analyze all the discovery material is correct, this by itself is insufficient prejudice to deny leave to amend, particularly when trial has not yet commenced and is not likely to do so for some time.").

The Court does not find bad faith in Plaintiffs' failure to mention the new allegations in the joint status reports. *See* Defs. Opp. at 20.  Each status report concerned the parties' "current efforts by the parties to seek a resolution" of the land-use application process. *E.g.*, [DE 82].  "[I]mproper police conduct, warrantless searches[,] and seizures" hardly concern those efforts. *See* Defs. Opp. at 20.  The Mikvah issue is not in the status reports because it became relevant after February 21, 2020, the date of last status report.  Before March 2020, Defendants allegedly told Plaintiffs they could develop the Mikvah "as of right"; but after March 2020, Defendants withheld the certificate of occupancy because the Mikvah did not comply with religious-use building regulations.  SAC ¶¶ 289–94; *see* [DE 82].

Any alleged delay, bad faith, and prejudice is insufficient to bar Plaintiffs' leave to file the SAC.

### D.   *Foman*-Futility

The R&R did not reach the issue of *Foman*-futility on any of Plaintiffs' seventeen causes of action.  R&R at 35 n.6.  Leave to amend may be denied as futile if proposed amended complaint would not withstand a FRCP 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, "whether the proposed complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 92 (2d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)); *e.g.*, *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).  The party opposing leave to amend bears the burden of establishing that the amendment would be futile.  *E.g.*, *Seemann v. Coastal Env't Grp., Inc.*, 219 F. Supp. 3d 362, 366 (E.D.N.Y. 2016).

The parties devote a section of their objection submissions to three Supreme Court decisions issued after the FRCP 15 motion was filed.  Though the parties never state this "objection" concerns *Foman*-futility, it ostensibly relates to that issue, at least with respect to the merits of the Land-Use Claims' facial challenges to the Defendants' POW Law and regulations.

Plaintiff argue the three decisions "support the conclusion that the POW Law facially is unconstitutional because it fails strict scrutiny."  Obj. at 16 (analyzing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 210 L.Ed.2d 137 (2021); *Tandon v. Newsom*, 141 S. Ct. 1294, 209 L.Ed.2d 355 (2021); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 208 L.Ed.2d 206 (2020) ("*Roman Catholic Diocese IV*")).  Defendants respond that *Roman Catholic Diocese of Rockville Centre v. Incorporated Village of Old Westbury* controls and the rational basis standard of review applies.  Obj. Resp. at 15–19 (discussing 128 F. Supp. 3d 566 (E.D.N.Y. 2015) ("*Roman Catholic Diocese III*")).

These arguments build upon the parties' views of the merits, fleshed out in greater detail in the underlying motion to amend submissions.  *See* Pls. Mem. at 10–12; Defs. Opp. at 11–20; Pls. Reply at 5–6, 9–10.  As a consequence, the parties' analyses of the merits is spread between two separate sets of briefs.  Rather than the

Court engrafting these new arguments onto older ones, the parties will be given the opportunity to brief their full and current positions on the merits.

Accordingly, the Court "decline[s] to rule on whether the amendment would be futile," *Intercloud Sys., Inc. v. Integration Partners Corp.*, 2017 WL 11570456, at *1 (S.D.N.Y. July 31, 2017) (citing cases). Instead, Defendants are granted leave to move to dismiss. Obj. Resp. at 1 (requesting permission to proceed with a motion to dismiss). Doing so here will "better allow the [C]ourt to consider the merits of [P]laintiffs['] case." *See Brown v. City of New York*, 2015 WL 7253874, at *1 (S.D.N.Y. Nov. 13, 2015). To be clear, the Court makes no finding at this time regarding the plausibility or timeliness of any of Plaintiffs' seventeen causes of action against any Defendant, *see* Defs. Opp. at 17–20, 18–20 nn. 7–10, 21–22 & n.12, 24, and Defendants may re-raise these arguments in their FRCP 12(b)(6) motion.

## CONCLUSION

For the reasons discussed above, Plaintiffs' objections are sustained in part and overruled in part, the R&R is adopted in part, Plaintiffs' motion to amend is granted, Defendants' motion to strike is denied, and Defendants are granted leave to move to dismiss. The Court will enter a separate order setting the briefing schedule on Defendants' motion to dismiss after Plaintiffs file the SAC. Plaintiffs shall file the SAC, *see* [DE 92-3], incorporating (without substantive alteration) the Konikov Declaration allegations on or before October 21, 2021.

**SO ORDERED.**

Dated: Central Islip, New York       s/ Denis R. Hurley
        September 30, 2021        Denis R. Hurley
                                  United States District Judge