**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------X
LUBAVITCH OF OLD WESTBURY, INC.
and RABBI AARON KONIKOV,

                     Plaintiffs,

       v.

INCORPORATED VILLAGE OF OLD WESTBURY,
NEW YORK; THE BOARD OF TRUSTEES OF
THE INCORPORATED VILLAGE OF OLD
WESTBURY, NEW YORK; MAYOR FRED
CARILLO, in his official capacity and individually;
TRUSTEE HENRY ALPERT, in his official
capacity and individually; TRUSTEE HARVEY
SIMPSON, in his official capacity and individually;
TRUSTEE MICHAEL WOLF, in his official
capacity and individually; TRUSTEE ELAINE
GREENBERG, in her official capacity; TRUSTEE
CORY BAKER, in his official capacity and
individually; TRUSTEE JEFFREY K. BROWN, in
his official capacity; TRUSTEE MARINA
CHINERINE, in her official capacity; TRUSTEE
LESLIE FASTENBERG, in her official capacity;
TRUSTEE EDWARD NOVICK, in his official
capacity and individually; TRUSTEE
CHRISTOPHER SAUVIGNE, in his official
 capacity; TRUSTEE ANDREW WEINBERG, in
his official capacity; MICHAEL MALATINO,
in his official capacity as Superintendent of
Buildings, and individually; THE POLICE
DEPARTMENT OF THE INC. VILLAGE OF
OLD WESTBURY, NEW YORK; and DOE
INC. VILLAGE OF OLD WESTBURY, NEW
YORK POLICE OFFICERS 1 through 15,

                  Defendants.
------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

2:08-CV-05081 (GRB) (LGD)

**LEE G. DUNST**, Magistrate Judge:

      Presently before the Court is a motion to partially dismiss this action, which has been pending

for more than fourteen years and involves factual allegations going back to 1994.  In the years since

the initial complaint was filed on December 17, 2008, this case has been assigned (and then

reassigned) to four District Judges (Judges Thomas C. Platt, Denis R. Hurley, Joan M. Azrack, and

currently Gary R. Brown) and four Magistrate Judges (Judges A. Kathleen Tomlinson, E. Thomas Boyle, Arlene R. Lindsay, and currently the undersigned). Furthermore, numerous law firms and attorneys have come and gone on behalf of the parties over this lengthy time span. As a reminder to the parties, they have an affirmative obligation under Federal Rule of Civil Procedure ("Rule") 1 "to secure the just, *speedy*, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added). During a conference on April 21, 2017, Judge Hurley aptly observed that "the case had "been in [a] state of flux *where nothing actually happened for years*." Electronic Case File number ("ECF No.") 93-3 at 15:24–16:1 (emphasis added). The undersigned agrees with Judge Hurley. It is difficult to see how the parties have been living up to their Rule 1 obligation to obtain a "speedy" resolution in a case where the complaint was filed more than 5,000 days ago.[1]

Since 2008, Plaintiffs Lubavitch of Old Westbury, Inc. ("Lubavitch") and Rabbi Aaron Konikov ("Rabbi Kanikov;" together with Lubavitch, "Plaintiffs") have alleged that various and differing groups of defendants discriminated against Plaintiffs based on their religion, in violation of federal and New York law, by preventing them from opening a religious institution. *See generally* Complaint, ECF No. 1 ("Original Complaint" or "Compl."); Second Amended Complaint, ECF No. 110 ("SAC"). Presently before the Court, pursuant to the November 10, 2022 referral from the Honorable Gary R. Brown for a Report and Recommendation, is the Defendants' motion to partially dismiss the SAC. *See* Notice Of Motion, ECF No. 160. For the reasons set forth below, the

---

[1] In observing that this case is increasingly long in the tooth, the Court notes that, when the original complaint was filed on December 17, 2008, the first iPhone was still new, and now-President Joe Biden was still a United States Senator. *See United States v. Mayo*, No. 2:13-CR-48, 2013 WL 5945802, at *7 n.8 (D. Vt. Nov. 6, 2013) (recognizing that the first iPhone was released in July 2007); *Biden, Joseph Robinette (Joe), Jr. Biography*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONG., https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=b000444 (last visited Jan. 31, 2023) (noting that now-President Biden was a United States Senator from January 3, 1973 until January 15, 2009). Moreover, the movie *Avatar* had not yet been released and the first Bitcoin had not yet been issued when this lawsuit was filed. *See Dean v. Cameron*, 53 F. Supp. 3d 641, 643-44 (S.D.N.Y. 2014) ("[T]he blockbuster 2009 feature film *Avatar* . . . became the highest-grossing film of all time by at least one measure."); *F.T.C. v. BF Labs Inc.*, No. 4:14-CV-00815, 2014 WL 7238080, at *1 n.1 (W.D. Mo. Dec. 12, 2014) ("Bitcoin is a payment system and digital currency created in 2009.").

undersigned respectfully recommends that the Court grant Defendants' motion (ECF No. 160), as well as dismiss *sua sponte* all claims against The Board Of Trustees Of The Incorporated Village Of Old Westbury, New York.[2]

## I.  BACKGROUND

Given that the SAC concerns "facts spanning over twenty-five years, the last thirteen of which enmesh with this Court's oversight thereof," this section addresses both the relevant facts and procedural history.  *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury*, *New York*, No. 08-CV-5081, 2021 WL 4472852, at *1 (E.D.N.Y. Sept. 30, 2021) (approach adopted by Judge Hurley, who explained these circumstances "lend themselves to the Background Section interweaving the merits with the procedure").  Unless otherwise specified, the facts set forth herein are taken from the SAC and documents incorporated into the SAC by reference.  *See Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022).

### A.     The Parties

Plaintiff Lubavitch is a New York religious corporation serving the Orthodox Jewish community in Old Westbury, New York with plaintiff Rabbi Konikov as its emissary.  *See* SAC ¶¶ 1-2, 14, 78-79, 120.

In the SAC, Plaintiffs assert claims against thirty-one different defendants—specifically, three entities, thirteen named individuals, and fifteen John Does.  Defendant the Incorporated Village of Old Westbury, Inc. (the "Village") is a municipal corporation.  *Id*. ¶ 85.  The Village is governed by defendant Village Board of Trustees (the "Board"), which consists of the Village mayor and four trustees.  *Id*. ¶ 87.  Defendant Edward J. Novick ("Novick") is presently the mayor (a position he has

---

[2] Pursuant to the undersigned's February 3, 2023 Order (and at Defendants' request), the undersigned is issuing this revised Report and Recommendation to address additional aspects of Defendants' first motion to dismiss (ECF No. 160).  *See* ECF No. 168.  The second motion to dismiss filed by Defendants (ECF No. 162) is not addressed herein and will be the subject of a separate Report and Recommendation by the undersigned.

held since 2020), and he previously served as a trustee from 2015 to 2020. *See id.* ¶ 106. Defendants Cory Baker ("Baker") and Marina Chimerine ("Chimerine") are presently trustees and have held those positions since 2015. *Id.* ¶¶ 101, 104. Defendant Jeffrey K. Brown ("Brown") is presently a trustee and has held that position since 2019. *Id.* ¶ 103. Defendant Andrew Weinberg ("Weinberg") is presently a trustee, has held that position since 2020, and previously served as a trustee from approximately 2013 to 2015. *Id.* ¶ 108. Defendant Michael Malatino ("Malatino") advises the Board in his capacity as the Superintendent of Buildings and Public Works. *Id.* ¶ 109.

Several defendants were previously Board members. Defendant Fred Carillo ("Carillo") served as a member of the Board from 1995 until 2020, with his time from before 2008 spent as a trustee and his time thereafter spent as mayor. *Id.* ¶ 88. The following defendants were formerly trustees at various points over the last two decades: Henry Alpert ("Alpert"), Michael Wolf ("Wolf"), Elaine Greenberg ("Greenburg"), Harvey Simpson ("Simpson"), Leslie Fastenberg ("Fastenberg"), and Christopher Sauvigne ("Sauvigne"). *See id.* ¶¶ 93, 95, 97, 99-100, 105, 107. Each of the aforementioned individual defendants is sued both in his official capacity and individually—except Greenberg, Brown, Fastenberg, Sauvigne, Chimerine, and Weinberg are sued solely in his or her official capacity.[3]

Defendant Police Department of the Incorporated Village of Old Westbury, New York ("OWPD") is the police force which employed Defendants Police Officers Doe 1 through 15. *Id.* ¶¶ 113-14. This Report and Recommendation refers to all these entities and individuals named as defendants in the SAC collectively as "Defendants."

---

[3] Plaintiffs previously named two additional defendants who are no longer parties because they died during the pendency of this action. Prior to his death in or about 2012, Steven Greenburg had been a trustee and a defendant in this action (as well as married to defendant Elaine Greenburg). SAC ¶¶ 98-99. Prior to his death in January 2018, Harvey Blau ("Blau") had been a mayor, a trustee, and a defendant in this action. *Id.* ¶ 91.

**B.      1994: Rabbi Konikov's Religious Use Of His Home**

In January 1994, Rabbi Konikov and his wife rented a home near Glen Cove Road in Old Westbury to offer prayer services. *Id.* ¶ 173. In July 1994, Carillo and Blau warned Rabbi Konikov that the Village prohibited religious land use without a permit and that such activity must cease. *Id.* ¶ 174. In September 1994, the Village commenced an action to "enjoin [Rabbi Konikov and his wife] from inviting guests to their home for prayer."[4] *Id.* ¶¶ 81–82; *see id.* ¶¶ 174–75. In May 1995, due to the commencement of that action, Rabbi Konikov's landlord issued a notice of intention to terminate the lease and directed Rabbi Konikov and his wife to vacate the premises. *See id.* ¶¶ 81–82, 174–75.

**C.      1998-2007: Plaintiffs' Purchase Of The Property, Efforts To Use The Property For Religious Purposes, Pursuit Of Tax-Exempt Status, And Village Negotiations**

Between 1998 and 1999, Plaintiffs determined that another nearby property in Old Westbury (specifically, 267 Glen Cove Road) would meet their needs to serve their Orthodox Jewish community. *Id.* ¶ 58. In 1999, Plaintiffs acquired the lot at 267 Glen Cove Road to develop a Temple, impart religious education, and provide related religious services and fellowship. *See id.* ¶¶ 11, 14, 57, 78-79. Plaintiffs have since acquired three additional adjoining properties that, together with the lot at 267 Glen Cove Road, comprise approximately seven acres. *Id.* ¶¶ 4–13. Unless otherwise noted, this Report and Recommendation will use the term "Property" to reference these aggregate four lots in Old Westbury.

In May 1999, after they purchased the property at 267 Glen Cove Road, Plaintiffs applied for the necessary building permits. *Id.* ¶ 60. Unnamed "Village officials" rejected that application and gave the alleged "pretextual" justification that the Village was contemplating—though had not yet implemented—a moratorium on construction. *Id.* ¶¶ 60-63. In June 1999, the Village imposed that

---

[4] The action was captioned *Inc. Village of Old Westbwy v. Aaron and "Jane" Konikov and Benny and Henia Nissan, Sup. Ct., Nassau County.* SAC ¶ 81.

moratorium as it began to consider a Place of Worship Law ("POW Law") applicable to religious land use applicants. *Id.* ¶¶ 62, 149. According to Plaintiffs, the Village imposed the moratorium "to assess options and discourage what the Village[,] including Alpert, Blau, Carillo, Simpson, and Wolf knew were several pending and intended religious land development and use applications." *Id.* ¶ 150. In March 2001, the Village ended the moratorium and adopted the POW Law. *Id.* ¶ 62. The POW Law requires properties to meet certain conditions, such as having a minimum lot size of twelve acres, before they can be put to religious use. *Id.* ¶ 162; *see id* ¶ 64 (describing additional prerequisites the POW Law imposes before the Village authorizes properties to be used for religious purposes).

On October 29, 1999, notwithstanding the denial of their religious use permit application several months earlier, Plaintiffs invited worshippers to a dedication ceremony to be held at the Property the following month. *Id.* ¶¶ 182–84. One week before the planned ceremony, the Village issued a notice to Plaintiffs that, absent a permit, the event would be an impermissible religious activity. *Id.* ¶ 185. According to Plaintiffs, this notice reflects how the Village, the Board, Alpert, Carillo, Simpson, Wolf, and Blau "intended to stop and discourage Plaintiffs' religious use" of the Property. *Id.* ¶ 186. The SAC does not state whether Plaintiffs held the ceremony. *See id.* ¶¶ 182-86.

In April 2000, Nassau County granted the Property tax-exempt status. *Id.* ¶¶ 176-77. The Village, however, allegedly "did not recognize" that status and continued to direct property tax notices to Plaintiffs. *Id.* ¶¶ 179–180. In July 2002, the Village alerted Plaintiffs that, regardless of their Nassau County tax-exempt status, they must apply directly to the Village to receive exemption from Village property taxes.[5] *Id.* In December 2002, Plaintiffs applied for Village tax-exempt status, which the Village granted in part and denied in part in March 2003. *Id.* ¶ 181.

---

[5] The Village also informed Plaintiffs that a property tax lien on the Property had been sold at public auction. SAC ¶ 180. Plaintiffs satisfied that debt to prevent transfer of the Property deed. *Id*.

During the four years from 2001 to 2005, Plaintiffs "attempt[ed] to negotiate the material terms of religious land use and development on the . . . Property." *Id.* ¶ 67; *see id.* ¶ 189 ("Plaintiffs negotiated with the Village and its officials and representatives for years . . . ."). Since 2004, and continuing to the present, Plaintiffs have rented another location to fulfill their religious mission. *Id.* ¶ 238. In 2006, Plaintiffs renewed their religious-use application but, in December 2007, Defendants summarily denied the application due to noncompliance with the POW Law. *Id.* ¶¶ 68, 190.

### D.    2008-2009: Commencement Of This Action, Stipulation Of Partial Dismissal, And Administrative Hold

Plaintiffs commenced this action on December 17, 2008 against the Village, the Board, Blau, Carillo, Alpert, Wolf, and Simpson. *See* Compl.; SAC ¶ 84. The parties nevertheless continued direct negotiations. SAC ¶ 191-92. On June 25, 2009, Carillo "conveyed" that he and the other defendants in the Original Complaint would "pave the way toward issuance of a building permit for the [Property] as it then existed." *Id*. ¶ 193. To that end, Wolf reportedly promised that if Plaintiffs followed his "directives," then Plaintiffs' religious land use application "would be approved, including without presentation to the Village Board of Zoning Appeals or any other Village Body" and instead would be reviewed "solely" by the Board. *Id.* ¶ 194.

On August 3, 2009, the parties filed a joint stipulation (which was dated July 31, 2009) stating that "Plaintiffs hereby dismiss without prejudice all claims against Defendants Harvey Blau, Fred J. Carillo, Henry A. Alpert, Michael Wolf, and Harvey Simpson" and requesting that "the remaining claims in this case be placed on administrative hold while Plaintiffs file a special use permit application . . . and until a determination is made by the [Board] with respect thereto." ECF No. 29. District Judge Thomas C. Platt so-ordered that stipulation on August 4, 2009. ECF No. 30 (the "Voluntary Dismissal"). As a result of Judge Platt's 2009 order (issued with Plaintiff's consent), the Board and the Village were the only defendants who still remained in the case.

### E.      2009–2015: Further Negotiations, Second Special Use Application, And Motion To Dismiss

From 2009 into 2015, the parties held several meetings where Wolf "consistently assured Rabbi Konikov" that the Village would "prompt[ly] approv[e]" a special use permit for the Property if negotiations resulted in an acceptable agreement.  SAC ¶¶ 195–98; *see id.* ¶ 199 (listing meeting dates and attendees between 2013 and 2015).  At these negotiations, Plaintiffs disclosed their intention to add space for religious education—prompting Defendants to "repeatedly threaten[]" to classify the Property for educational use, which would implicate additional provisions under the POW Law. *Id.* ¶ 158.  Plaintiffs also proposed developing a Mikvah, which is a building for ritual cleansing, bathing, and purification associated with Jewish religious ceremonies.  *See id.* ¶¶ 54, 110, 310. According to Plaintiffs, "Defendants" "agreed" in 2012 that Plaintiffs could develop a Mikvah "as of right" on the Property, and Malatino inspected the facility during its construction.  *Id.* ¶¶ 311.

In the six years that followed Judge Platt's Voluntary Dismissal order, the parties filed five status reports that provided updates on the status of Plaintiffs' special use application.  *See* ECF Nos. 32, 35, 37, 38, 43.  On June 18, 2014, due to "delays in changing demands," Plaintiffs requested a settlement conference with Magistrate Judge Arlene R. Lindsay.  ECF No. 37.  The Village and the Board opposed this and instead requested an order that the parties meet and confer.  ECF No. 38.  On July 9, 2014, Judge Lindsay ordered the parties to meet and confer first.  ECF No. 41.  As a result, the administrative hold (previously ordered by Judge Platt) remained in place.

In "mid-2015," Carillo approached Rabbi Konikov to enlist his support in Weinberg's run-off election campaign to serve as a Board Trustee.  SAC ¶¶ 217, 220.  Specifically, Rabbi Konikov was asked to endorse Weinberg, deliver absentee ballots, support Weinberg on social media, attend public events, and "send over [his] people to vote" for Weinberg.  *Id.* ¶ 230.  In exchange, Plaintiffs "would receive the least intensive review possible" under the New York State Environmental Quality Review Act ("SEQRA"), that review would be completed in less than one year, and Plaintiffs would receive

their requested permits.  *Id.* ¶¶ 226-27; *see also id.* ¶¶ 221, 224-25 (describing repeated offers to approve Property permits if Plaintiffs supported Weinberg's candidacy).  However, Rabbi Konikov declined and merely advised his constituents, as he had done previously, that Weinberg's opponent (defendant Fastenberg) "categorically opposed" Plaintiffs' plans and "would use her considerable influence to prevent" them from materializing.[6]  *Id.* ¶ 232.

On November 6, 2015, Carillo and Wolf allegedly convinced Rabbi Konikov to submit to the Village an application for a development on the Property that Plaintiffs call a "Compelled Chabad" because it would be a "substantially reduced facility" relative to the previously-denied application from six years earlier.[7]  *Id.* ¶¶ 199, 200, 240.  On November 13, 2015, Plaintiffs applied for approval of the Compelled Chabad; but the Village summarily rejected the application that same day because "no prior denial letter had issued."  *Id.* ¶¶ 200–01.  Plaintiffs were then instructed to obtain a denial letter.  *Id.* ¶ 202.  Five days later, Malatino advised Plaintiffs that "he was instructed by his superiors, including the Board . . . , to not issue the denial letter."  *Id.* ¶¶ 203-04.  According to Plaintiffs, the Village at that point deemed prior negotiations "null and void" due to a large turnover in Board members.[8]  *Id.* ¶¶ 206–08.  On December 2, 2015, Plaintiffs were told "that they must . . . start their religious land use application from the beginning."  *Id.* ¶ 205.

Plaintiffs' next status report (dated December 3, 2015) again requested a settlement conference.  ECF No. 43.  The Village and the Board asked Judge Dennis R. Hurley (to whom the case had been reassigned) to either continue the administrative hold or grant them leave to move to

---

[6] Defendant Fastenberg won that 2015 election and "replaced" Weinberg on the Board.  SAC ¶¶ 105, 108, 206.

[7] The Compelled Chabad would be a more limited facility in that, among other things, 70% of its useable space would be underground; the above ground portion would be "not suitable for group prayer or other similar religious assembly" and "less inviting" than similar facilities on smaller lots in the Village; it could not have a kitchen; and it would have one-third less square footage than Plaintiffs' 1999 proposal.  SAC ¶ 243.

[8] "The Village Board membership had changed dramatically earlier in 2015, with Defendants Baker, Chimerine, and Fastenberg joining the Board" and Wolf—who was a chief negotiator with Plaintiffs—resigning therefrom.  SAC ¶¶ 206, 208.

dismiss.  ECF No. 44.  Shortly thereafter, Plaintiffs advised Judge Hurley that their application for a special use permit had been unsuccessful.  ECF No. 45.  Noting the lack of "any significant progress" made to that end, Judge Hurley set a briefing schedule for the Village and the Board's motion to dismiss, which required in relevant part that the opening brief be served by January 19, 2016. *See* December 22, 2015 Order.

> ### F.    January 2016-May 2017: Third Special Use Permit Application, Motion To Amend/Supplement The Original Complaint, And Holding Motions in Abeyance

At an unspecified time in early 2016, Plaintiffs again filed for a special use application for the Property, which retained the same "reduced facility" specifications for a "Compelled Chabad" from the previously denied November 2015 submission (the "Third Special Use Application"). SAC ¶¶ 240–41.  This 2016 application remains pending.  *Id.* ¶ 240.

On February 12, 2016, Plaintiffs unilaterally filed a First Amended Complaint.  ECF No. 47 ("FAC").  Judge Hurley struck the FAC because Plaintiffs filed it without the Court's permission.[9] *See* February 17, 2016 Order.  Plaintiffs, in turn, sought to file a motion for leave to file the FAC. ECF No. 51.  The Court set that briefing schedule and held in abeyance the then-pending motion to dismiss the Original Complaint—with opening papers served but still not filed formally with the Court.  *See* March 3, 2016 Order.

On January 31, 2017, after reviewing the parties' submissions concerning Plaintiffs' motion for leave to file the FAC, Judge Hurley scheduled a March 16, 2017 conference "for the discrete purpose of determining what is necessary for the Plaintiffs to file their formal [special use permit] Application with the Defendants."  ECF No. 58.  The Court held Plaintiffs' motion to amend in abeyance.  *Id.*

---

[9] Plaintiffs advised that the FAC complied with Rule 15(a)(1)(B) because it was filed within twenty-one days after the opening motion to dismiss papers were served.  ECF No. 49.  The Village and the Board responded that Plaintiffs nonetheless required the Court's permission under Rule 15(d) to file the FAC because it contained allegations regarding events postdating the Original Complaint.  ECF No. 50.

Following several extension requests, Judge Hurley held the conference on April 21, 2017.
*See* April 21, 2017 Minute Entry.  The Court directed the parties to arrange for the Village Building Inspector to approve or reject the pending Third Special Use Application because approval would be "the end of the matter" and denial would satisfy "a condition precedent" to Plaintiffs seeking "the relief sought" from the Board.  ECF No. 93-3 at 14:14-16:6.  Judge Hurley further expressed his intention "not to see this get lost" given that the case had "been in [a] state of flux where nothing actually happened for years."  *Id.* at 15:24–16:1.  The Village and Board agreed to "identify deficiencies or purported deficiencies in the application materials" and meet with Plaintiffs to address them.  *Id.* at 18:23–21:7.  The Court directed the parties to attend a conference on May 18, 2017, during which the parties reported they were working to address the deficiencies that prevented the Village Building Inspector from approving or rejecting the Third Special Use Application.  *See id.* at 22:9–15; ECF No. 62.  For the next three years, the parties submitted joint status reports to Judge Hurley.  *See* ECF Nos. 62-82.

### G.    June-December 2017: Alleged OWPD Search And Application Submission

The June 29, 2017 status report disclosed that the parties anticipated finalizing Plaintiffs' Third Special Use Application the following week.  ECF No. 63.  According to Plaintiffs, on June 30, 2017, OWPD officers allegedly arrived at Rabbi Konikov's house and "coerced [Mrs. Konikov] to permit them to search the home for a 'burglar' vaguely identified as 'Nicholas' without a warrant or sufficient probable cause."  SAC ¶ 47.  Notably, the next status report, dated July 20, 2017—and subsequent status reports—did not mention the OWPD "search."  The July 20, 2017 report stated that Plaintiffs' application was not yet complete because the "government entity" responsible for measuring the roadway at the front of the Property had not yet done so.  ECF No. 64.

Several months later, in mid-October, the Third Special Use Application was submitted.  *See* ECF Nos. 67–68.  The Village Board conducted a public hearing on the application on December 18,

2017 and planned to continue that hearing in January 2018.  ECF No. 68.

### H.    2018: Progress on the Third Special Use Application And The SEQRA Review

At the January 2018 hearing, "[t]he Board directed Plaintiffs to amend the application and provide additional materials" and scheduled another hearing for March 2018.  ECF No. 69.  As Plaintiffs' "professionals work[ed] to revise the items requested," the hearing date was adjourned to April, then May, and finally June.  ECF Nos. 70, 71, 72.  According to the parties' August 1, 2018 status report, Plaintiffs' engineers had "submitted all the requested materials" but the Village "misplaced" them.  ECF No. 73.  The Village nonetheless reportedly continued to "review[]" the materials and anticipated "requiring additional follow-up questions."  *Id.*  As of August 1, 2018, no questions were received and no further public hearing had been held.  *Id*.

On September 17, 2018, the Board instituted the SEQRA process.  ECF No. 74.  That process entails a "Positive Declaration" that subjects the Property (and similar religious land use applicants) to a "heightened assessment" of the proposed use and development.  SAC ¶ 31.  In November 2018, the Board declared itself the "Lead Agency" for the SEQRA review.  ECF No. 75.

### I.    2019: Appearance Ticket, SEQRA, OWPD Stop, Mikvah, And Public Hearing

In February 2019, Malatino visited the Property without prior notice.  SAC ¶¶ 275–76.  Upon inspection, Malatino decided to issue, but not yet serve, an appearance ticket because he determined "a[n access] road had been constructed" on the Property without authorization, in violation of the Village code (the "Appearance Ticket").  *Id.* ¶¶ 282–84.  According to Plaintiffs, the access road "existed for decades" before they acquired the Property, and the Property contains a "beneficial easement" allowing use of the access road.  *Id*. ¶¶ 277-78.  Later that month, on February 20, 2019, OWPD officers arrived at Rabbi Konikov's home in the evening allegedly with lights flashing, sirens blaring, dressed in full body armor, and equipped with "firearms at the ready" to serve the Appearance Ticket.  *Id.* ¶¶ 285–86.  According to Plaintiffs, the Village later offered to dismiss the ticket if

Plaintiffs renounced the easement, Plaintiffs declined, and the matter went to trial—where Malatino testified that he believed the access road involved religious use given Plaintiffs' pending land-use application. *Id.* ¶¶ 289–91.  The SAC does not state the result of that trial.

On April 15, 2019, the Board issued the Positive Declaration under SEQRA. *Id.* ¶ 315.  The Positive Declaration requires "studies and assessments, with responses to later comments and revisions to revisions" that, according to Plaintiffs, together "add[] additional years before a final determination within the Village's assessment scheme." *Id.* ¶ 34.

During the evening of Friday, July 5, 2019 (the Sabbath for observant Jews), Rabbi Konikov walked approximately twelve miles from a vigil in Cambria Heights, Queens to his home in Old Westbury.[10] *Id.* ¶¶ 255–61.  OWPD officers recognized Rabbi Konikov (when he stopped to briefly rest) on the side of Glen Cove Road, approached him, and asked him for identification. *Id.* ¶¶ 262–63.  But Rabbi Konikov does not carry identification on the Sabbath. *Id.* ¶ 263.  After they confirmed Rabbi Konikov's destination and stated they "know who you are," the officers attempted to force Rabbi Konikov into a patrol car. *Id.* ¶¶ 264–66.  Rabbi Konikov "passively resisted" because he may neither travel by motorized transport nor expose himself to electronic recording devices (like police body or patrol car cameras) on the Sabbath. *Id.* ¶ 267.  After approximately twenty minutes of "passive resistance," the officers allowed Rabbi Konikov to walk the rest of the way home while they followed in a patrol car. *Id.* ¶ 271.

By August 1, 2019, Plaintiffs submitted a Draft Environmental Impact Statement ("DEIS") pursuant to the positive SEQRA declaration.  ECF No. 79.  On August 5, 2019, the Court ordered the parties to "provide details as to what approvals or processes they need in the interim, and the relevant dates they expect them to happen" before the case could be dismissed. *See* August 5, 2019 Order. That same month, the OWPD searched a residential home that Plaintiffs own on Bacon Road in Old

---

[10] Travel by "motorized transport" on the Sabbath is "prohibit[ed]" by Jewish "faith and practice."  SAC ¶ 267.

Westbury, allegedly "attempt[ing] to find and seize" evidence against Plaintiffs.  SAC ¶ 47.

Plaintiffs finally completed construction of their Mikvah on the Property in September 2019. *Id.* ¶ 131.  By that point, Malatino had performed multiple inspections without commenting on the Mikvah's construction.  *Id.* ¶¶ 294, 296.  Malatino inspected and gave his sign-off on the Mikvah. *Id.* ¶ 299-300.  At a September 16, 2019 public hearing about the SEQRA requirements for the Property development, Plaintiffs allegedly faced "insult[ing], disparag[ing], and demean[ing]" remarks from those in attendance.  *Id.* ¶¶ 49, 325.  In response to one concern about Jewish religious activity, Carillo reportedly grinned and remarked: "Do you know how long that [it's] going to take [for Plaintiffs to get final approval]? . . . Trust me. You don't have anything to worry about." *Id.* ¶ 325.  The meeting also raised several issues not addressed by Plaintiffs' DEIS, related to, among other things, an easement and an adjacent parcel acquired in August 2018.  *See* ECF No. 81.

The following month, in October 2019, the Village denied the Mikvah a certificate of occupancy, citing the need to "conform the premises for a place of public assembly or commercial code standard" and complete a Fire Marshal's inspection.[11]  *Id.* ¶¶ 304, 307.  Plaintiffs, however, obtained confirmation from the Fire Marshal that the Mikvah was a private residential accessory building not subject to the public assembly or commercial code standard.  *Id.* ¶¶ 305, 307.

The October 21, 2019 joint status report notified the Court that Plaintiffs "ha[d] not yet finalized the 'Draft Scope' and revised site plan for the SEQRA review, the [DEIS] and for the Special Exception Permit."  ECF No. 81.  The parties indicated it was "possible that there could be a decision on Plaintiffs' application by late-2020 if all of the necessary steps are taken."  *Id.*

---

[11] The changes necessary to conform with that code standard would require Plaintiffs to, among other things, install at the Property "a fire warning or similar commercial grade fire suppression system" and "an elevator or mechanical lift."  SAC ¶ 304.  According to Plaintiffs, these changes may be made only at a "prohibitive cost."  *Id.*

**J.    Early 2020: Final Scope for the DEIS And Denial of Certificate of Occupancy**

On February 11, 2020, the Village adopted a Final Scope for the DEIS.  SAC ¶ 316.  The Final Scope lists twenty-two subjects to be addressed by Plaintiffs in the DEIS, some of which Plaintiffs allegedly addressed in earlier submissions.  *Id.* ¶¶ 316–17, 321.  The parties' February 21, 2020 status report told the Court that, "[u]pon review of the DEIS as complete, the [Board] will continue to review, including appropriate public hearings."  ECF No. 82.

On March 2, 2020, Defendants once again declined to issue a certificate of occupancy for the Mikvah.  SAC ¶ 308.  Defendants now construed the Mikvah as part of Plaintiffs' still-pending Third Special Use Application.  *Id.*; *see id.* ¶ 309 ("In sum and substance, Defendants in March 2020 said that because the Mikvah may someday exist on a Chabad Property that includes a building for religious use, it must satisfy building codes applicable to commercial uses and places of public assembly . . . .").

**K.    Alleged Financial Consequences For Plaintiffs**

Plaintiffs attribute the following financial losses to Defendants' actions over the past two decades: (1) $300,000 in professional fees (either cash or donated services); (2) $15 million in lost pledged donor commitments; (3) $2.5 million in unrealized gross donations and collections from ordinary religious use; (4) $2 million in "excess rental costs," consisting "in the aggregate" of "lost building equity and location and religious programming disruptions;" and (5) $70,000 in costs to address Malatino's concerns with the Mikvah.  SAC ¶¶ 234–38, 299.  Plaintiffs anticipate that the costs imposed by the SEQRA review "will approach or exceed $250,000."  *Id.* ¶ 322

**L.    Mid 2020-Present: Lifting The Administrative Hold And Motion Practice Regarding The SAC**

On June 2, 2020, Plaintiffs filed a letter requesting a pre-motion conference with Judge Hurley to lift the administrative hold (ordered eleven years earlier by Judge Platt) and move for leave to file the SAC.  ECF No. 84.  The Village and the Board opposed this request.  *See* ECF No. 86 (arguing,

among other things, that the administrative hold "has been working exactly as contemplated" given that "[a]ll that remained outstanding was Plaintiffs' filing of the DEIS . . . Once submitted, the Village estimates that the review process could be completed and a final decision rendered within four to six months."). On July 6, 2020, Judge Hurley "lift[ed] the stay so that Plaintiffs can file a motion to amend the complaint . . . ." July 6, 2020 Order.

After the parties briefed the motion, Magistrate Judge Lindsay (to whom the motion had been referred) issued a Report and Recommendation on the motion, and the parties filed objections thereto, Judge Hurley granted Plaintiffs leave to file the SAC on September 30, 2021. *See Lubavitch of Old Westbury*, 2021 WL 4472852, at *20. In that decision, Judge Hurley explicitly "decline[d] to rule on whether the amendment would be futile" and instead granted Defendants leave to move to dismiss the SAC. *Id*. at *19-20 (internal citations, alterations, and quotations omitted). Judge Hurley further clarified that he "ma[de] no finding . . . regarding the plausibility or timeliness of any of Plaintiffs' seventeen causes of action against any Defendant, and Defendants may re-raise these arguments in their FRCP 12(b)(6) motion." *Id*. (internal citations omitted).

On October 20, 2021, Plaintiffs filed the 237-page SAC that is the subject of the current partial motion to dismiss. *See* SAC. The SAC asserts seventeen causes of action ("COA") against thirty-one entities and individuals now named as Defendants:

(1) violation of the right to Free Exercise under the First and Fourteenth Amendments, brought under 42 U.S.C. § 1983 ("Section 1983");

(2) violation of the right to Free Speech and Free Association under the First and Fourteenth Amendments, brought under Section 1983;

(3) violation of the right to Freedom of Association under the First and Fourteenth Amendments, brought under Section 1983;

(4) violation of the right to Equal Protection under the Fourteenth Amendment, brought under

Section 1983;

(5) violation of the right to Due Process under the Fourteenth Amendment, brought under Section 1983;

(6) substantial burden on religious exercise in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc(a);

(7) discrimination against an assembly or institution on the basis of religion in violation of the RLUIPA, 42 U.S.C. § 2000cc(b)(2);

(8) imposition of a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, in violation of the RLUIPA, 42 U.S.C. § 2000cc(b)(1);

(9) retaliation against the exercise of First, Fourth, Fifth, and Fourteenth Amendment rights, brought under Section 1983;

(10) unconstitutional search and seizure (regarding various instances in which the OWPD stopped Rabbi Konikov as he walked home on the Sabbath) in violation of the Fourth and Fifth Amendments, brought under Section 1983;

(11) unconstitutional search and seizure (regarding the July 5, 2019 occasion in which OWPD stopped Rabbi Konikov) in violation of the Fourth and Fifth Amendments, brought under Section 1983;

(12) unauthorized search (of the Property) in violation of the Fourth Amendment, brought under Section 1983;

(13) retaliatory fraudulent inducement in violation of the RLUIPA and Section 1983;

(14) civil conspiracy in violation of 42 U.S.C. § 1985(3) ("Section 1985");

(15) failure to prevent interference with civil rights in violation of 42 U.S.C. § 1986 ("Section 1986");

(16) violation of rights under New York State Constitution Article I Sections 3, 8, 9, 11; and

(17) discrimination in violation of New York Civil Rights Law ("NYCRL") § 40-c.

Twelve of these claims (specifically COAs 1-8 and 14-17) primarily relate to land use and were raised in the Original Complaint ("Original Claims"). The five remaining claims (COAs 9-13) are newly asserted in the SAC and involve events in or after 2017—namely Rabbi Konikov's encounters with the OWPD, the Appearance Ticket, and the denial of the Mikvah's certificate of occupancy ("New Claims").

Judge Hurley subsequently set a briefing schedule on Defendants' motion to dismiss, granted the parties leave to file expanded briefs, and extended the briefing schedule to August 10, 2022. *See* March 11, 2022 Order; April 21, 2022 Order; May 24, 2022 Order. The case then was reassigned to the undersigned magistrate judge on June 8, 2022 and to District Judge Joan M. Azrack on July 8, 2022. On August 10, 2022, the parties timely filed their motion papers. *See* ECF Nos. 160-62. On October 20, 2022, Judge Azrack referred the motions to the undersigned for a Report and Recommendation. *See* October 20, 2022 Order Referring Motion. On November 2, 2022, Judge Azrack recused herself, and the case was reassigned to Judge Gary R. Brown. ECF No. 165. On November 10, 2022, Judge Brown confirmed that the motions remained referred to the undersigned for a Report and Recommendation.[12] *See* November 10, 2022 Order.

## II.    LEGAL STANDARD

Courts evaluate motions to dismiss under Rule 12(b)(6) by determining whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That standard requires the Court to accept as true all well-pled factual allegations in the

---

[12] As noted above, the second motion to dismiss filed by Defendants (ECF No. 162) will be addressed in a separate Report and Recommendation.

SAC and consider attachments to and documents incorporated by reference in the SAC.  *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).  While the Court accepts the SAC's well-pled allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 664; *see also id*. at 678 (explaining that a complaint must contain "more than an unadorned, the defendant-unlawfully-harmed-me accusation").  Determining whether the SAC states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 664.

## III.    DISCUSSION

Defendants seek dismissal of (1) all claims against Greenburg, Fastenberg, and Sauvigne because they were sued only in their official capacities as Village trustees but are no longer on the Board, (2) all claims against current Village personnel Novick, Baker, Brown, Chimerine, Weinberg, and Malatino in their official capacities because they are duplicative of the claims against the Village, (3) all claims against the OWPD because it is not a suable entity, (4) the Original Claims against all individual defendants sued in their individual capacity because they are time barred, and (5) the New Claims against the individual defendants sued in their individual capacity because they fail to state a claim or violate Rule 8.  *See* ECF No. 160-1 ("Def. Mem.").[13]

### A.    The Claims Against Greenburg, Fastenberg, And Sauvigne

Plaintiffs concede in essence that Greenburg, Fastenberg, and Sauvigne (the "Former Trustee Defendants") are improper parties under Rule 25(d) because they no longer serve on the Board and were sued only in their official capacities.  *Compare* Def. Mem. at 10-11 *with* Opp.  Rule 25(d) provides that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is

---

[13] The following claims in the SAC are *not* subject of Defendants' pending dismissal motion at ECF No. 160: (1) claims against the Village, (2) claims against the Board, and (3) claims against Doe Inc. Village Of Old Westbury, New York Police Officers 1 through 15.

automatically substituted as a party."  Fed. R. Civ. P. 25(d); *see also id*. ("The court may order

substitution at any time, but the absence of such an order does not affect the substitution.").

In a last-ditch effort to keep these claims afloat, Plaintiffs ask in a footnote for the Court "to

stay this action" against the Former Trustee Defendants so that Plaintiffs may pursue "evidence"

sufficient to bring individual capacity claims against the Former Trustee Defendants.  Opp. at 2 n.3.

Plaintiffs cite no legal authority for that request.  In any event, the instant dismissal motion involves

the claims presently asserted against the Former Trustee Defendants, which the parties agree cannot

proceed.  The undersigned rejects Plaintiffs' stay request and concludes that the claims against the

Former Trustee Defendants should be dismissed.  *See Kamerling v. Massanari*, 295 F.3d 206, 215 n.*

(2d Cir. 2002) (substituting official capacity defendant for his successor through operation of Rule

25(d)); *Jimmeson v. Berryhill*, 243 F. Supp. 3d 384, 384 n.1 (W.D.N.Y. 2017) (same); *Encarnacion ex

rel. George v. Astrue*, 491 F. Supp. 2d 453, 456 n.1 (S.D.N.Y. 2007) (same), *aff'd*, 568 F.3d 72 (2d

Cir. 2009).

## B.    The Official Capacity Claims Against Novick, Baker, Brown, Chimerine, Weinberg, And Malatino

"[A]n official-capacity suit against a municipal official 'is, in all respects other than name, to

be treated as a suit against the governmental entity.'"  *Quinones v. City of Binghamton*, 997 F.3d 461,

466 n.2 (2d Cir. 2021) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (internal alterations

omitted).  That is, an official capacity suit "is *not* a suit against the official personally, for the real

party in interest is the entity."  *Kentucky*, 473 U.S. at 166.  "Within the Second Circuit, where a

plaintiff names both the municipal entity and an official in his or her official capacity, district courts

have consistently dismissed the official capacity claims as redundant."  *Phillips v. Cnty. of Orange*,

894 F. Supp. 2d 345, 385 n.35 (S.D.N.Y. 2012) (collecting cases).  Thus "[w]here, as here, the entity

also is named as a defendant, the official capacity claims are redundant and are properly dismissed."

*Md. Ashik Islam v. Melisa*, No. 18-CV-2535, 2020 WL 1452463, at *4 n.3 (E.D.N.Y. Mar. 24, 2020)

(quoting *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 264 n.2 (S.D.N.Y. 2006)).

Accordingly, given that the Village is a defendant in this action, the undersigned recommends that all claims against current Village personnel Novick, Baker, Brown, Chimerine, Weinberg, and Malatino in their official capacities be dismissed.[14]  *See Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 640 (E.D.N.Y. 2018) (dismissing official capacity claims "[b]ecause the Town is named as a defendant"); *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010) ("Since the Town is named in the Complaint, the claims against Defendants, in their official capacities, are dismissed as duplicative and redundant").

### C.    The Claims Against The OWPD And The Board

Plaintiffs assert claims against the Board and the OWPD, but the Court finds that these entities are not properly subject to suit and all claims against them should be dismissed.  The Village formed the OWPD as its municipal law enforcement agency.  SAC ¶ 113; *see Inc. Vil. of Old Westbury v Am. Alternative Ins. Corp.*, No. 15-CV-07278, 2017 WL 6210874, at *7 (E.D.N.Y. Jan. 19, 2017) (holding the OWPD is "clearly" the Village's "law enforcement agency"), *report and recommendation adopted*, 2017 WL 6210850 (E.D.N.Y. Mar. 31, 2017), *aff'd*, 710 F. App'x 504 (2d Cir. 2018); *see also* N.Y. VILLAGE LAW § 8-800 (authorizing the Village to form and disband the OWPD).  "In New York, however, agencies of a municipality are not suable entities because they are merely administrative arms of a municipality, and do not have a legal identity separate and apart from the municipality."  *MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419

---

[14] Plaintiffs' arguments opposing dismissal of the official capacity claims against current Village personnel miss the mark substantially for the reasons discussed in Defendants' reply brief.  *Compare* Opp. at 16-18 *with* ECF No. 160-3 at 3-4.  In *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, the court did not address the redundancy of the claims against an individual defendant in his official capacity because he did not move for dismissal of those claims based on their redundancy.  *See* 111 F. Supp. 3d 459, 493 (S.D.N.Y. 2015).  In *Schubert v. City of Rye*—where the Court dismissed the official capacity claims against the City of Rye mayor, city council, and city council members as redundant to the claims against the City of Rye—the Court noted in a footnote that whether the official capacity claims against the City Engineer and City Manager were redundant was a "matter[] for another day" because the Court dismissed those claims on their substance.  775 F. Supp. 2d 689, 700 & n.7 (S.D.N.Y. 2011).

(S.D.N.Y. 2010) (internal quotations omitted); *see Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities;" collecting cases). Accordingly, "[u]nder New York law, a municipal police department has no separate legal identity apart from the municipality that created it, and is thus a non-suable entity." *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 547 n.1 (S.D.N.Y. 2014) (dismissing claims against White Plains Police Department); *see Henry v. Cnty. of Nassau*, 6 F.4th 324, 336 (2d Cir. 2021) (affirming dismissal of claims against Nassau County Police Department because it is a non-suable entity); *Harrison v. Inc. Vill. of Freeport*, 498 F. Supp. 3d 378, 399 (E.D.N.Y. 2020) (dismissing claims against Village of Freeport Police Department because it is a non-suable entity).

Under the same principle, the Court finds *sua sponte* that the Board is likewise an entity that is not properly subject to suit.[15] *See Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco*, No. 17-CV-8586 (CS), 2019 WL 1368560, at *13 (S.D.N.Y. Mar. 26, 2019) (dismissing Village of Mount Kisco Board of Trustees); *Cent. UTA of Monsey v. Vill. of Airmont, New York*, No. 18-CV-11103, 2020 WL 377706, at *24 (S.D.N.Y. Jan. 23, 2020) (dismissing Village of Airmont Board of Trustees); *Glacken v. Inc. Vill. of Freeport*, No. 09-CV-4832, 2011 WL 7546425, at *2 (E.D.N.Y. June 27, 2011) (recommending dismissal of the Village of Freeport Board of Trustees), *report and recommendation adopted*, 2012 WL 895392 (E.D.N.Y. Mar. 15, 2012); *see also* N.Y. VILLAGE LAW § 3-301(1) ("Every village shall have . . . four trustees, except that the board of trustees of a village may change the number of trustees as authorized by section 3-304 of this article.").

The Court therefore concludes that all claims against the OWPD and the Board should be dismissed.

---

[15] While Defendants did not move to dismiss the claims against the Board in the instant motion (ECF No. 160), "[a] district court's ability *sua sponte* to dismiss a complaint that lacks a basis in law or fact is well-established." *Muka v. Murphy*, 358 F. App'x 239, 241 (2d Cir. 2009) (citing *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (holding that "district courts may dismiss a frivolous complaint *sua sponte*" and affirming such a dismissal)); *see SPA 79 D L.P. v. Nat'l Credit Union Admin.*, No. 20-CV-301, 2022 WL 4126049, at *2 n.1 (E.D.N.Y. Sept. 9, 2022) (Brown, J.) ("[T]he Court hereby, *sua sponte*, dismisses the ninth cause of action as without basis in law.").

**D.    The Original Claims Against Alpert, Wolf, Simpson, Carillo, Novick, Baker, and Malatino**

Defendants argue that the statute of limitations has run on the Original Claims as against each of the remaining defendants sued in his individual capacity: Carillo, Alpert, Wolf and Simpson—who were named as defendants in the Original Complaint (the "Original Individual Defendants")—and current village personnel Novick, Baker, and Malatino (the "Current Trustee Defendants").[16] Generally, the burden rests with defendants to plead and prove the affirmative defense that a claim is time barred. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021). Defendants, however, may properly move to dismiss a claim when "the dates in a complaint show that an action is barred by a statute of limitations." *Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021) (quoting *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)); *see Whiteside*, 995 F.3d at 319 (recognizing that a court "may dismiss a claim on statute-of-limitations grounds at the pleadings stage if the complaint clearly shows the claim is out of time" (internal quotations and alterations omitted)).

There are several different limitations periods applicable to the claims that are the subject of the dismissal motion. "[T]he four-year catch-all federal statute of limitations, codified at 28 U.S.C. § 1658(a), governs claims brought under RLUIPA." *Congregation Adas Yereim v. City of New York*, 673 F. Supp. 2d 94, 107 (E.D.N.Y. 2009). A three-year limitations period applies to Plaintiffs' claims under Section 1983, Section 1985, the New York Constitution, and NYCRL § 40-c.[17] *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) (addressing Section 1983 claims arising in New York); *Paige v. Police Dep't of City of Schenectady*, 264 F.3d 197, 199 n.2 (2d

---

[16] For convenience, this Report And Recommendation includes Malatino in the defined term "Current Trustee Defendants" notwithstanding that Malatino serves as an advisor to the Board in his capacity as the Superintendent of Buildings and Public Works. SAC ¶ 109.

[17] State law governs the limitations period for claims under Section 1983 and Section 1985; such claims arising in New York are subject to the state's three-year limitations period for personal injury actions. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (addressing Section 1983); *Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 762 (S.D.N.Y. 2019) (addressing Section 1985).

Cir. 2001) (addressing Section 1985 claims arising in New York); *423 S. Salina St., Inc. v. City of Syracuse*, 68 N.Y.2d 474, 482, 503 N.E.2d 63, 66 (1986) (addressing New York Constitution claims); *Durham v. Suny Rockland Cmty. Coll.*, No. 14-CV-607, 2016 WL 128214, at *6 (S.D.N.Y. Jan. 12, 2016) (addressing NYCRL § 40-c claim).  Finally, the Section 1986 claim for failure to prevent interference with civil rights is subject to a one-year statute of limitations.  42 U.S.C. § 1986.

Defendants' limitations argument relies on two premises.  First, (as noted above) the relevant limitations periods span one to four years.  Def. Mem. at 7.  Second, the Voluntary Dismissal (stipulated to by Plaintiffs and ordered by Judge Platt) renders "the situation[] as if the action never had been filed" against the Original Individual Defendants for purposes of calculating the limitations period.  Def. Mem. at 6 (quoting *United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 19 (2d Cir. 2019)).  Therefore, according to Defendants, because Alpert, Wolf, and Simpson left the Board by 2015 and "are not alleged to have involvement since [then]," all claims against them expired in the intervening six years before Plaintiffs filed the SAC.  *Id.* at 8; *see also* SAC ¶¶ 42, 93, 107 (alleging Alpert is a "former Trustee" who acted with Blau (who left the Board in 2015), Wolf, and Simpson); *id.* ¶¶ 95-97 (alleging Wolf negotiated with Plaintiffs until he resigned from the Board in November 2015); *id.* ¶ 100 (alleging Simpson was a Board trustee until 2015).  Defendants argue that the Original Claims are untimely as against Carillo and the Current Trustee Defendants because the limitations period necessarily expired during the twelve years between the filings of the Original Complaint and the SAC in light of the intervening Voluntary Dismissal.  *See* Def. Mem. at 8, 12.

Plaintiffs in essence concede that the Original Claims, standing alone, are untimely against the Original Individual Defendants and the Current Trustee Defendants.  Instead, Plaintiffs contend that— notwithstanding the Voluntary Dismissal that they agreed to and Judge Platt approved—their claims against the Original Individual Defendants and Current Trustee Defendants are timely due to equitable estoppel, the continuing violation doctrine, and relation back principles.  *See* ECF No. 160-2 ("Opp.")

at 11-14.  The Court disagrees.

      1.   <u>Equitable Estoppel</u>

A defendant may be equitably estopped from raising a statute of limitations defense "where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit" until after the limitations period expired.  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49-50 (2d Cir. 1985)).  "To invoke equitable estoppel, a plaintiff must show that: '(1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment.'"  *Id.* (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)).  While that federal doctrine applies to most federal claims, including Plaintiffs' claims under the RLUIPA and Section 1986, the New York State doctrine of equitable estoppel applies to Plaintiffs' claims governed by state law limitations periods—specifically, the claims under New York law, Section 1983, and Section 1985.  *See Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 441 n.4 (S.D.N.Y.) ("There is no question that the New York state doctrine of equitable estoppel is applicable to state-law causes of action in federal court."), *aff'd*, 579 F. App'x 7 (2d Cir. 2014); *Dowe*, 419 F. Supp. 3d at 762 (recognizing that, for federal claims that borrow state statutes of limitations, such as Sections 1983 and 1985, "courts 'borrow not only a state's limitations period but also its tolling rules.'" (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)).  Equitable estoppel under New York law similarly requires defendants to have engaged in "fraud, misrepresentations, or deception" that was "specifically directed at preventing the plaintiff from bringing suit" until after the limitations period expired.  *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.), *aff'd*, 579 F. App'x 7 (2d Cir. 2014); *see Zumpano v. Quinn*, 6 N.Y.3d 666, 674, 849 N.E.2d 926, 929 (2006) ("[E]quitable estoppel [requires] plaintiffs to establish that subsequent and specific actions by defendants somehow

kept them from timely bringing suit.").

Plaintiffs argue that the Original Individual Defendants and Current Trustee Defendants are equitably estopped from raising a statute of limitations defense because of the circumstances underlying the joint stipulation that Plaintiffs agreed to and Judge Platt later approved in the Voluntary Dismissal on August 4, 2009. Specifically—according to a July 11, 2022 declaration from Rabbi Konikov submitted in opposition to the instant motion (and drafted nearly 13 years after Judge Platt's order)—Plaintiffs agreed to the Voluntary Dismissal only because the Original Individual Defendants "would not negotiate" during settlement conferences unless they were dismissed from this case. *See* Opp. at 3 (citing ECF No. 162-7 ¶¶ 47-49); *id*. at 11-13. Plaintiffs refer to that supposed arrangement as the "2009 Deal" and claim it was "renew[ed]" in a "2017 Deal." *Id.* at 3, 5. As set forth below, the Court rejects Plaintiffs' attempt to invoke equitable estoppel to vitiate the stipulated Voluntary Dismissal.

"When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotations omitted). Applying this principle, the Court declines to consider the July 11, 2022 declaration from Rabbi Konikov. *See, e.g.*, *Koehler v. Metro. Transportation Auth.*, 214 F. Supp. 3d 171, 174 (E.D.N.Y. 2016) (adopting this approach); *Costa v. Astoria Fed. Sav. & Loan Ass'n*, 995 F. Supp. 2d 146, 148–49 (E.D.N.Y. 2014) (holding that additional factual allegations submitted in opposition to dismissal "are inappropriate for consideration by this Court"). Because it is premised on allegations contained solely in Rabbi Konikov's declaration, the Court finds Plaintiffs' estoppel argument lacking.[18] *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016) (vacating

---

[18] Plaintiffs also cite the SAC to support the argument that the Original Individual Defendants "induced Plaintiffs

adjudication of a motion to dismiss because it relied on an affidavit extraneous to the complaint); *Friedl*, 210 F.3d at 84 (same).

Even if the Court accepted the allegations in Rabbi Konikov's declaration, the undersigned would still reject Plaintiffs' estoppel argument.  As the Court noted above, the federal equitable estoppel doctrine applicable to Plaintiffs' RLUIPA and Section 1986 claims requires that the Original Individual Defendants "caused [Plaintiffs] to delay in bringing [their] lawsuit." *Ellul*, 774 F.3d at 802 (quoting *Cerbone*, 768 F.2d at 50).  New York's equitable estoppel doctrine applicable to Plaintiffs' New York, Section 1983, and Section 1985 claims similarly requires that "defendants somehow kept [Plaintiffs] from timely bringing suit." *Zumpano*, 6 N.Y.3d at 674, 849 N.E.2d at 929.  But Plaintiffs seek to invoke equitable estoppel based on conduct that allegedly occurred *after* Plaintiffs filed suit (and while the Original Claims were pending).  *See* Opp. at 3, 11-13.  That "unusual" contention fails because Plaintiffs "not only [knew they] could have sued . . . but did so" *before* the conduct underlying their equitable estoppel argument allegedly occurred.  *Pearl*, 296 F.3d at 84-85 (holding that plaintiff could not rely on equitable estoppel to overcome the untimeliness of reasserted Section 1983 claims even if the prior settlement of those claims could be vacated due to defendants' fraud inducing that settlement).  Indeed, Plaintiffs' rarely advanced position on equitable estoppel "has been well and truly put to rest by the courts that have faced it."  *Cunningham v. Interlake S.S. Co.*, No. 06-CV-1641, 2007 WL 2034284, at *2-3 (N.D. Ohio July 10, 2007) (collecting cases; rejecting argument that defendant should be equitably estopped from raising the statute of limitation defense after it "misled" plaintiff into stipulating to voluntary dismissal), *aff'd*, 567 F.3d 758 (6th Cir. 2009); *see*

---

to negotiate, acted in bad faith in those negotiations, or never intended to agree, while causing Plaintiffs to believe the opposite."  Opp. at 4 (citing SAC ¶¶ 209-16).  But the SAC alleges that those supposed bad faith negotiations were undertaken "*solely* to discourage and dissuade Plaintiffs from developing the Chabad Property" and not to induce Plaintiffs to dismiss the claims against the Original Individual Defendants. SAC ¶ 213 (emphasis added).  To the extent Plaintiffs argue the cited portions of the SAC support their estoppel arguments, the Court rejects that position as inconsistent with Plaintiffs' pleading. *See Isaly v. Bos. Globe Media Partners LLC*, No. 18-CV-9620, 2020 WL 5659430, at *6 (S.D.N.Y. Sept. 23, 2020); *James v. Countrywide Fin. Corp.*, No. 10-CV-4953, 2013 WL 249459, at *2 (E.D.N.Y. Jan. 23, 2013).

*Mamer v. Apex R.E. & T.*, 59 F.3d 780, 782 (8th Cir. 1995) (declining to equitably estop defendant from raising a statute of limitations defense because plaintiff was not "in any way abridged by forces beyond his control" given plaintiff "actually filed a timely action" and the "subsequent dismissal of that action was granted at [plaintiff]'s own request").

### 2. Continuing Violation Doctrine

Plaintiffs further argue the continuing violation doctrine applies because they pled an "ongoing and escalating" pattern of discrimination. Opp. at 13-14. The continuing violation doctrine provides an "exception to the normal knew-or-should-have-known accrual date" for calculating limitations periods. *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999). The doctrine allows a plaintiff to bring certain claims that would otherwise be barred by the statute of limitations, provided that "an act contributing to that [violation] took place within the statutory time period." *Purcell v. New York Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 65 (2d Cir. 2019) (internal quotations omitted). It applies to particular federal claims that "by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal quotations and alterations omitted). The Court assumes for purposes of addressing Plaintiffs' argument that the continuing violation doctrine could apply to all of Plaintiffs' federal claims.[19]

Plaintiffs overlook that "where the continuing violation doctrine applies, the limitations period begins to run when the defendant has '*engaged in enough activity to make out an actionable claim*.'"

---

[19]  The continuing violation doctrine "typically arises in the context of a complaint of unlawful workplace discrimination challenged under Title VII of the Civil Rights Act of 1964." *Gonzalez*, 802 F.3d at 220. Courts have also applied the doctrine to Plaintiff's federal claims under Section 1983, 1985, and the RLUIPA. *See Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) (applying the doctrine to Section 1983 and 1985 claims); *Roman Cath. Diocese of Rockville Ctr., New York v. Inc. Vill. of Old Westbury*, No. 09-CV-5195, 2011 WL 666252, at *12 n.20 (E.D.N.Y. Feb. 14, 2011) ("It appears from the relatively scant federal case law on the issue . . . that a continuing violation theory could apply to claims brought pursuant to RLUIPA."). The undersigned is not the first to analyze the continuing violation doctrine as though it applies to the remaining federal claim under Section 1986. *See Jones v. Burge*, No. 11-CV-4143, 2012 WL 2192272, at *8 (N.D. Ill. June 13, 2012) (noting that, even if it could apply, the continuing violations doctrine was not sufficiently invoked to preserve the untimely Section 1986 claim).

*Id*. (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)) (emphasis added). Indeed, it "would subvert the underlying purpose of the time limit, which is to ensure expedition in the filing and handling of claims of discrimination, to apply the continuing violation exception in cases where a plaintiff is on notice of alleged discriminatory acts." *Basdeo v. New York City Transit Auth.*, No. 20-CV-5553, 2022 WL 4121379, at *4 (E.D.N.Y. Sept. 9, 2022) (quoting *Sundaram v. Brookhaven Nat. Lab'ys*, 424 F. Supp. 2d 545, 560 (E.D.N.Y. 2006)). Comparing the Original Complaint (filed in 2008) and the SAC (filed in 2020), it is clear to the Court that the Original Individual Defendants "engaged in enough activity" for Plaintiffs "to make out" the Original Claims over ten years ago.[20] *Chapdelaine v. Town of Eastford*, 708 F. App'x 699, 701 (2d Cir. 2017) ("Chapdelaine's claims do not fall within the continuing violation doctrine because the Town engaged in enough activity to make out an actionable claim in 2011" (internal quotations omitted)); *see Corsini v. City of New York*, No. 20-CV-5459, 2021 WL 5999631, at *8 (E.D.N.Y. Dec. 20, 2021) ("[T]he factual allegations do not support application of the continuing violation doctrine as Plaintiff fails to allege that he was unaware of the alleged due process violation when the City issued the civil penalties . . . ."). That is, "even assuming the continuing violation doctrine could apply to this context, the limitations period began to run" for the Original Claims "no later than . . . the time [Plaintiffs] brought this action" in 2008. *Smith v. City of N.Y.*, 664 F. App'x 45, 47 (2d Cir. 2016); *see Herzlich v. Nassau B.O.C.E.S.*, No. 12-CV-220, 2013 WL 5406607, at *7 (E.D.N.Y. Sept. 23, 2013) ("Plaintiff cannot invoke the continuing violation exception to avoid statute of limitations problems when he knew after each allegedly wrongful act that such act was actionable . . . ."). Accordingly, the continuing violation doctrine does not preserve the Original Claims against the Original Individual

---

[20] Indeed, the SAC acknowledges that "Plaintiffs' lawsuit has been pending before this Court since 2008" and the parties to the Original Complaint, including Plaintiffs, "were aware of [the] allegations on or about the date [the Original Complaint] was served." SAC ¶ 84. Whether "the full extent of the injury" was "known or predictable" at the time the Original Claims became actionable is a nonfactor because "otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace v. Kato*, 549 U.S. 384, 391 (2007).

Defendants or the Current Trustee Defendants.

Plaintiffs' continuing violation arguments fail against the Original Individual Defendants, Baker, and Novick for an additional reason.[21]  The doctrine "is defendant-specific." *Gibson v. Cnty. of Suffolk*, No. 19-CV-03871, 2022 WL 1063017, at *6 (E.D.N.Y. Feb. 18, 2022) (Brown, J.) (explaining that the doctrine "balances the burden imposed on plaintiffs by statutes of limitations" against the need to put each defendant "on notice to defend within the period of limitation" and the need to uphold each defendant's "right to be free of stale claims" (internal quotations omitted)).  To that end, the doctrine requires Plaintiffs to "allege[ a wrongful] act committed by each particular defendant that falls within the . . . statutory period." *Lucente*, 980 F.3d at 310.  The SAC, however, does not allege any conduct by Alpert, Wolf, or Simpson *after* they left the Board in November 2015—over four years before Plaintiffs moved for leave to file the SAC on June 2, 2020.[22]  Nor does the SAC allege any action by Carillo after November 2015 (other than merely implying to an attendee at a September 2019 public hearing that the review of Plaintiffs' application would, given its scope, likely take a "long" time).[23]  *See* SAC ¶¶ 199-200 (alleging Carillo told Rabbi Konikov on November

---

[21] This paragraph does not address Malatino because the SAC alleges Malatino engaged in wrongful conduct during the limitations period. *See, e.g*, SAC ¶¶ 275–76, 282 (alleging Malatino's February 2019 "unauthorized search" of the Property caused the issuance of the Appearance Ticket); *id.* ¶¶ 111, 304 (alleging Malatino in September and October 2019 "decided arbitrarily" to decline to issue a certificate of occupancy for the Mikvah and required it to meet "commercial or place of public assembly fire codes"); *id.* ¶¶ 307–13 (alleging Malatino in March 2020 "concocted" the "pretextual rationale" to again deny a certificate of occupancy for the Mikvah on the basis that it is identified on Plaintiffs' pending application to develop the Compelled Chabad).

[22] Plaintiffs correctly contend that the timing of their claims is measured from the date they moved for leave to file the SAC (June 2, 2020), not the date they were granted permission to do so (September 30, 2021).  *See* Opp. at 11 n. 8.  ("The proper date is the date on which the notice of motion to amend, proffering the proposed amendment, is filed with the Court.  *See, e.g., Durstenberg v. Electrolux Home Products, Inc.*, 15 CIV. 9277 (CM), 2016 WL 750933, at *3 (S.D.N.Y. Feb. 23, 2016) (citing *Perez v. Paramount Communications, Inc.*, 92 N.Y.2d 749, 754 (1999)).  That date is June 2, 2020, i.e., the date on which Plaintiffs, proffering the proposed SAC with their request, sought a lift of the stay and leave to file a motion to amend with the Court consistent with its Individual Practice Rules.").

[23] The undersigned rejects Plaintiffs' conclusory allegation "on information and belief" that Malatino acted in September and October 2019 "at the behest" of Carillo and Baker when the former declined to issue a certificate of occupancy.  SAC ¶¶ 111, 131; *see Petedge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (rejecting "conclusory assertions" that conduct was undertaken at the "direction" of a defendant; collecting cases rejecting similar assertions as conclusory); *Algarin v. New York City Dep't of Corr.*, No. 06-CV-508, 2006 WL 1379605, at *1 (S.D.N.Y. May 19, 2006) (mere allegation that defendant acted "at the behest" of another was "far too conclusory to survive a motion to dismiss").

6, 2015 that Plaintiffs could proceed with the proposed development application); *id.* ¶ 325 (alleging Carillo's September 2019 comment).  Further, the SAC does not allege any particular action taken by Novick or Baker within the limitations period.  *See id.* ¶ 102 (alleging Baker "failed to mitigate" service of the Appearance Ticket and was "aware" of OWPD activities); *id.* ¶ 106 (alleging Novick was merely "aware" of this case and actions by others); *id.* ¶ 141 (relying on group pleading to conclude the Village, Novick, Baker, and five others generally "prohibited" Plaintiffs from developing the Mikvah since 2019).  Accordingly, Plaintiffs' continuing violation doctrine argument fails against the Original Individual Defendants, Novick, and Baker for the independent reason that none are alleged to have engaged in wrongdoing within the limitations period.[24]  *See Shomo*, 579 F.3d at 183 (finding continuing violation doctrine did not preserve claims against a defendant because it was not alleged that he took any wrongful action within the limitations period); *Gibson*, 2022 WL 1063017, at *7 (same).

### 3.    Relation Back

Finally, Plaintiffs argue that the SAC's claims "are deemed filed at the same time as the [Original Complaint] for statute of limitations purposes" because the SAC "relates back" to the Original Complaint.  Opp. at 14 (initial capitals omitted).  In support of that argument, Plaintiffs rely upon a portion of Judge Hurley's decision permitting Plaintiffs to file the SAC, which stated in relevant part that the "New Claims and allegations in support sufficiently relate to the [Original] Complaint."  *Id.* (quoting *Lubavitch of Old Westbury*, 2021 WL 4472852, at *17) (internal alterations omitted).  However, Plaintiffs misread the totality of Judge Hurley's decision and take that phrase out of context. That excerpt addressed whether the New Claims were sufficiently related to the Original

---

[24] The undersigned reaches the same conclusions to the extent Plaintiffs seek to invoke New York's "continuing wrong" doctrine.  *See Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 122 & n.2 (2d Cir. 2020) (finding continuing wrong doctrine could not render claims timely because defendant engaged in no wrongful conduct in the limitations period); *Grogan v. Seaford Union Free Sch. Dist.*, 18 Misc. 3d 1112(A), 856 N.Y.S.2d 24 (N.Y. Sup. Ct. 2007) (declining to apply continuing wrong doctrine after the point plaintiff "knew enough to make a claim"), *aff'd* 59 A.D.3d 596, 873 N.Y.S.2d 225 (N.Y. App. Div. 2d Dept. 2009).

Claims to meet the standard for a Rule 15(d) motion to supplement and did not concern the timeliness of any claims. *See Lubavitch of Old Westbury*, 2021 WL 4472852, at *16-17 (addressing "The New Claims aris[ing] out of events in 2017, 2018, and 2019"). In fact, contrary to Plaintiff's mischaracterization, Judge Hurley expressly "ma[de] no finding" as to the "timeliness of any of Plaintiffs' seventeen causes of action against any Defendant" and permitted Defendants to "re-raise these arguments" in the instant motion. *Id*. at *19.

Addressing the legal basis for Plaintiffs' argument, the Court finds that Plaintiffs cannot show that the Original Claims against the Original Individual Defendants and Current Trustee Defendants relate back to the Original Complaint. "Rule 15(c)(1)(C) provides the federal standard for relation back" applicable to claims against new defendants. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). That rule allows for an amended pleading to relate back to the date of the original pleading if, among other things, the new defendant to the claims subject to the relation back arguments "should have known that, *but for a mistake of identity*, the original action would have been brought against it . . . ." *Id.* (applying Fed. R. Civ. P. 15(c)(1)(C)(ii)); *Ceara v. Deacon*, 916 F.3d 208, 211 (2d Cir. 2019); *see Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 549 (2010) ("The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him."). But the requisite mistake is absent here, where the Original Complaint detailed the Original Individual Defendants' alleged misconduct and brought claims against the Original Individual Defendants before the Voluntary Dismissal by Judge Platt in 2009.[25] *See Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994) (finding relation back unavailable

---

[25] The SAC provides an additional basis for precluding relation back against Novick and Baker. Rule 15 requires that a party must have had actual or constructive notice of the aforementioned mistake of identity within 90 days of filing the original pleading. *See* Fed. R. Civ. P. 15(C)(1)(c) (requiring such notice to occur within the period provided by Rule 4(m) for serving the summons and complaint); Fed. R. Civ. P. 4(m) (requiring service within 90 days). The SAC specifies that Baker and Novick "have been aware of this lawsuit and its factual allegations coextensive with the commence[ment] . . . of [their] service on the Village Board of Trustees," which for both Baker and Novick occurred in 2015—over six years after the 2008 filing of the Original Complaint. SAC ¶¶ 84, 101, 106.

where prior complaint identified the defendants and detailed their conduct); *In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 236 (S.D.N.Y. 2012) (holding new claims cannot relate back to voluntarily dismissed claims); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2005 WL 1882281, at *1 (S.D.N.Y. Aug. 9, 2005) (same).

As to Plaintiffs' claims governed by limitations periods provided by state law, Rule 15(c)(1)(A) requires the Court to "determine if New York state law provides a more forgiving principle of relation back . . . compared to the federal relation back doctrine under Rule 15(c)(1)(C)." *Hogan*, 738 F.3d at 518. Courts applying that principle generally look to the New York state relation back standard in N.Y. C.P.L.R. Section 203, which "has been interpreted to embody essentially the same limitation as Federal Rule 15(c)(1)(C)." [26] *Neal v. Wilson*, 239 F. Supp. 3d 755, 761 (S.D.N.Y. 2017); *see Fahlund v. Nassau Cnty.*, 265 F. Supp. 3d 247, 259 (E.D.N.Y. 2017) ("Section 203 . . . closely tracks the federal relation-back requirement of Rule 15(c)(1)(C)" (internal quotations omitted)). Accordingly, Plaintiffs' failure to satisfy relation back for Rule 15(c)(1)(C) precludes them from invoking relation back under C.P.L.R. Section 203 for the claims with state-law-provided limitations periods (the New York State, Section 1983, and Section 1985 claims). *See Neal*, 239 F. Supp. 3d at 761 (finding inapplicability of Rule 15(c)(1)(C) precluded relation back under C.P.L.R. § 203); *Fahlund*, 265 F. Supp. 3d at 259 (same).

\*                    \*                    \*

The Court therefore rejects Plaintiff's efforts to evade the impact of the 2009 Voluntary Dismissal (which was issued with Plaintiffs' consent) and the expiration of the limitations periods for the Original Claims (COAs 1-8 and 14-17) against the Original Individual Defendants and the Current

---

[26] Courts also look to N.Y. C.P.L.R. § 1024 where, unlike here, the relation back concerns substituting a John Doe defendant. *See, e.g.*, *Hogan*, 738 F.3d at 518.

Trustee Defendants.

    **E.**    **The New Claims Against Carillo, Novick, Baker and Malatino[27]**

    All of the New Claims in the SAC are brought under Section 1983. Relevant here, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.'" *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue . . . ." *Id.*

    Defendants argue that the Ninth COA, which asserts a claim for retaliation against the exercise of Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights, is not viable because it contains no individual allegations against Carillo or the Current Trustee Defendants. Def. Mem. at 9, 12-13. The undersigned agrees. The relevant SAC allegations incorporate approximately 390 other SAC paragraphs and challenge various conduct by "Defendants" from "1999 through the present." SAC ¶¶ 379-87. They make clear that Plaintiffs "resort[ed] to group pleading" in the Ninth COA, and in doing so relied on "a tactic which is expressly disfavored with regard to Section 1983 claims." *Falcon v. City Univ. of New York,* No. 15-CV-3421, 2016 WL 3920223, at *12 (E.D.N.Y. July 15, 2016); *see Thomas v. Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) ("[I]t is insufficient for the plaintiffs to rely on group pleading against these defendants without making specific factual allegations against them" (internal quotations and alterations omitted)). On that basis, the Ninth COA cannot stand as pled. *See Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011) (affirming

---

[27] This section does not discuss Alpert, Wolf, or Simpson because the New Claims concern conduct that postdates any alleged involvement by those defendants.

dismissal of Section 1983 claims because they did not "allege facts establishing the personal involvement" of the relevant defendants); *Wilson v. City of New York*, No. 15-CV-3192, 2016 WL 2858895, at *2 (S.D.N.Y. May 16, 2016) (finding Section 1983 claims futile due to their reliance on group pleading).

Defendants further correctly contend that the allegations in support of the Tenth, Eleventh, and Twelfth COAs, each a Section 1983 claim alleging violations of Plaintiffs' Fourth and/or Fifth Amendment rights based on OWPD conduct, do not even mention Carillo or the Current Trustee Defendants—except that each COA repeats the same paragraph asserting "on information and belief" that Carillo and Baker were "aware of the actions of [OWPD]" as alleged in the relevant cause of action. Def. Mem. at 9 (quoting SAC ¶¶ 402, 413, 422). Plaintiffs counter that they adequately pled (largely elsewhere in the SAC) that Carillo and Baker "had oversight responsibility for the affairs of the [OWPD]." Opp. at 10 (citing SAC ¶¶ 41, 90, 101, 102, 402). Plaintiffs also rely on their allegation that "all Trustees routinely receive reports from the [OWPD] Chief." *Id*. (citing SAC ¶¶ 402; 446). The argument fails because Plaintiffs cannot pursue Section 1983 liability against Carillo or the Current Trustee Defendants arising from OWPD conduct based solely on supposed supervision of the OWPD and receipt of OWPD reports. *See Tangreti*, 983 F.3d at 619 (dismissing Section 1983 claim because it sought to impose liability "by reason of [defendant]'s supervision of others who committed the violation"); *LaPerre v. Cnty. of Nassau*, No. 08-CV-1642, 2009 WL 10670335, at *4 (E.D.N.Y. Nov. 13, 2009) (dismissing Section 1983 claim against defendants alleged to have had knowledge from "reports" of a constitutional violation), *report and recommendation adopted,* 2010 WL 9093240 (E.D.N.Y. Jan. 12, 2010), *aff'd*, 459 F. App'x 28 (2d Cir. 2012); *see also Citizens United v. Schneiderman*, 882 F.3d 374, 384–85 (2d Cir. 2018) (holding that a plaintiff may under certain circumstances satisfy the plausibility standard by pleading facts upon information and belief, but a plaintiff "cannot merely plop 'upon information and belief' in front of a conclusory allegation and

thereby render it non-conclusory.").

Finally, Defendants assert that the Thirteenth COA cannot stand against because—in violation of Rule 8(a)(2)—it "purports to allege violations of RLUIPA, the First Amendment and § 1983" based on varying "misconduct in 2012 and in 2019-2020" that altogether make it "impossible" to answer. Def. Mem. at 9 (making arguments with respect to Carillo); *see id*. at 12 (incorporating these arguments for the Current Trustee Defendants). Plaintiffs do not respond to this argument in their opposition. "Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014). Accordingly, "courts in this circuit have held that a plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitute an abandonment of those claims." *McLeod v. Verizon N.Y., Inc.*, 995 F. Supp. 2d 134, 143 (E.D.N.Y. 2014) (internal quotations and alterations omitted); *see Thomas v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 334, 354 (E.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed" (internal quotations omitted)). As such, Plaintiffs have abandoned their Thirteenth COA. *See Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 292-93 (E.D.N.Y. 2016) (deeming claims abandoned given failure to oppose dismissal arguments); *McLeod*, 995 F. Supp. 2d at 143 (same); *Thomas*, 938 F. Supp. 2d at 354 (same).

## IV.    CONCLUSION

For the reasons described above, the Court recommends that Defendants' motion to partially dismiss the SAC (ECF No. 160) be granted and that all claims against the Board be dismissed *sua sponte*. Accordingly, the undersigned recommends that all claims against all individual defendants, the OWPD, and the Board be dismissed. Dismissal of these claims—except for the New Claims (specifically, COAs 9-13) against Carillo, Novick, Baker, and Malatino in their individual

capacities—should be appropriate with prejudice because further amendment could not remedy the relevant deficiencies identified above. *See Melendez v. Sirius XM Radio*, Inc., 50 F.4th 294, 309 (2d Cir. 2022) (affirming dismissal with prejudice because amendment would be futile).

## V.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days). Any requests for an extension of time for filing objections must be directed to Judge Brown. FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS. *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).

**SO ORDERED:**

Dated:        Central Islip, New York        s/ Lee G. Dunst
              February 7, 2023        _____

              **LEE G. DUNST**
              United States Magistrate Judge