**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
LUBAVITCH OF OLD WESTBURY, INC.
and RABBI AARON KONIKOV,

|                        | |                           |
|------------------------|-|---------------------------|
|        Plaintiffs,     | | **MEMORANDUM OF**         |
|                        | | **DECISION & ORDER**      |
|      -against-         | | 08-CV-5081 (GRB)(LGD)     |

INCORPORATED VILLAGE OF OLD
WESTBURY, NEW YORK,

                                    Defendant.
-----------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

According to the official history of the Incorporated Village of Old Westbury, the area was settled by Quakers, after which for "the next 225 years Old Westbury remained virtually isolated by choice from any contact with the outside world."[1]  Then, according to Old Westbury's historical narrative, came the "Estates Era," beginning in the 1890s, during which "new large estates were [sic] from prominent New York City families."[2]  Following World War II, the story goes, development in the region "ushered in the third and present way of life for Old Westbury which led to the breaking up of these large estates into two-acre residential subdivisions," but then, "[i]n 1987, the Village up-zoned to four-acre residential properties."[3]  Against the backdrop of this case, the Village's self-view proves curious.

---

[1] Richard Gachot, *History of Old Westbury*, Village of Old Westbury https://www.villageofoldwestbury.org/175/History-of-Old-Westbury.

[2] *Id.*

[3] *Id.*  According to a report commissioned by the Village, there are several different residential districts, requiring a minimum of one, two or four acres for construction of a residence.  VHB Engineering, *Village of Old Westbury: Land Use and Zoning Study, June 2021* at 11, https://www.villageofoldwestbury.org/DocumentCenter/View/773/VOW-Land-Use-and-Zoning-Study-June-Update-PDF [hereinafter *Land Use Study*].

The Village Board confers at public meetings and (presumably) executive sessions at the Village Hall, located at 1 Store Hill Road.  At that address lies a multi-use facility that not only accommodates the needs of the Village Board, but also



*Old Westbury Village Hall with integrated Post Office facility.*

houses the Village's Police Department (which employs 35 individuals and includes a detective bureau, a patrol bureau and a communications center[4]), Administration



*Police Vehicles at Village Hall*

Building, Building Department, Water Department, Justice Court, Department of Public Works with a heavy



*Public Works Equipment at Village Hall*

equipment yard,[5] as well as several offices and



warehouses and even a branch of the United States Post Office. Satellite imagery of the facilities reveals an impressive array of buildings, vehicles, mounds of construction material and ample parking spaces to accommodate the multitude of activities.

Thus, the Village Hall represents a public epicenter, a hive of governmental, administrative, legal and community affairs.  And all of this action takes place on a lot that consists of, according to Nassau County records, 7.63 acres of land.[6]  Nestled in that facility, though, the Village Board

---

[4] https://www.villageofoldwestbury.org/156/Police-Department.
[5] https://www.villageofoldwestbury.org/155/Department-of-Public-Works
[6] https://lrv.nassaucountyny.gov/info/19++D++00710/.  Ironically, this is approximately the same size as the parcels owned by plaintiffs and subject of this litigation.

decided that to construct any kind of religious facility in the Village requires a minimum of 12 acres of land.[7]

Somehow, that does not seem right.

Presently before the Court is a Report and Recommendation ("R&R") of United States Magistrate Judge Lee G. Dunst providing recommendations regarding defendant's motion to dismiss the Second Amended Complaint (SAC) in this 16-year-old civil action, which represents the oldest matter on this Court's docket.  The R&R[8] describes the unacceptably long history of this case.  *See* DE 188 ("R&R") at 1-2.  Even a cursory review of this woeful tale makes it plain that this matter must be moved forward with deliberate speed.  First, however, the Court must consider the pending motion and Magistrate Judge Dunst's recommendations.[9]

In reviewing a Report and Recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Both parties have filed objections to the R&R, DE 192 and DE 193, thus requiring *de novo* review of the matters raised.  *See* 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)(3) (requiring *de novo* review after objections).  Importantly, the R&R follows a thoughtful, thorough Memorandum and Order by the Honorable Denis R. Hurley, which permitted the filing of the SAC and reviewed many of the issues dispositive of the instant motions.  *See Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York*, No. 08-CV-5081 (DRH)(ARL), 2021

---

[7] Of course, the so-called Places of Worship Law (bearing the unfortunate acronym "POW") contains other requisites for those who would attempt to construct a place of religious worship.  The acreage restriction, which appears relevant to this dispute, *see* Docket Entry ("DE") 110 at 139, represents a simple metric for the purpose of discussion.  There are other issues.  For example, the statute also provides that 35% of a 12-acre parcel must remain natural and undeveloped, and only 4% may be covered with a structure of any sort.  Old Westbury, N.Y., Code § 216-111.2.  The full code of the Village, including the POW Law, may be accessed at: https://ecode360.com/OL0821#OL0821.

[8] *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York*, No. 08-CV-5081 (GRB)(LGD), 2023 WL 9058143 (E.D.N.Y. Dec. 18, 2023).

[9] Appendix A offers a table providing an overview of Magistrate Judge Dunst's 42-page R&R and his recommendations regarding the disposition of the 17 causes of action contained in the SAC.

WL 4472852 (E.D.N.Y. Sept. 30, 2021) (*Lubavitch I*).[10]  In fact, Judge Hurley presents a thorough summary of the allegations of the 121-page SAC and an expertly-crafted overview of the procedural history of this matter, which are incorporated by reference herein.

Plaintiffs have filed objections solely to the recommendation concerning Count 3 of the Second Amended Complaint.  *See generally* DE 193.  Evidencing a predilection for overlitigation and elevation of form over substance, defendant objects to numerous recommendations, including recommendations that portions of *its* motion to dismiss should be *granted*.  *See generally* DE 192. To the extent the parties have not filed specific objections to certain recommendations, those are reviewed under a clear error standard.

**Facial Challenges and Ripeness of As-Applied Challenges to the Places of Worship Law**

Defendant's primary objections, as well as much of the instant motions, appear rooted in purported jurisdictional challenges based on ripeness, as well as continuing arguments as to whether plaintiffs have properly raised facial challenges to the POW Law.  Following a *de novo* review, Judge Hurley persuasively and eloquently determined that "[t]he SAC challenges the POW Law as unconstitutional on its face and alleges injury independent of Defendants' handling of Plaintiffs' land-use application," thereby averting any ripeness issue.[11]  Defendant, however, continues to press these arguments, even though Judge Hurley largely resolved these questions in his Memorandum and Order.

---

[10] While defendant argues that Judge Hurley's determinations were made pursuant to a different legal standard, the analysis contained in that decision nonetheless proves immensely helpful here.

[11] *Lubavitch I*, 2021 WL 4472852 at *12 (citing cases involving Equal Protection challenges under both the federal and state constitution, as well as Free Speech, Free Exercise and Free Association clauses under the First Amendment and under RLUIPA, equal terms claims under RLUIPA, and substantive due process claims).

A.  *The Validity of Facial Challenges*

On this motion, defendant endeavors to reargue the sufficiency of plaintiffs' allegations supporting a facial challenge to the POW Law, principally by relying on another district court opinion which, in a somewhat different context, found the POW Law facially neutral.[12]  DE 181-5 at 18 (citing *Roman Catholic Diocese of Rockville Center v. Incorporated Village of Old Westbury*, 128 F. Supp. 3d 566 (E.D.N.Y. 2015)).  With respect to this case, there are several distinguishing features and parts of the analysis with which this Court is forced to disagree.

First, in reaching its conclusion, the *Roman Catholic Diocese* decision accepted defendant's apparently unchallenged argument that, under the POW Law, "places of worship are treated the same as, or better than, not-for-profit schools, which are the only other institutions allowed in the Village's Residential Districts," *Roman Catholic Diocese*, 128 F. Supp. 3d at 583, an argument repeatedly made in this proceeding.  *See, e.g.*, 181-5 at 9 ("The POW Law imposed more stringent requirements for the development of non-profit schools.").  The argument proves misleading.[13]  The POW Law does include requisites for the development of private schools that are either coextensive or, in some instances, more restrictive than those imposed on places of worship in that amendment to its zoning code.  *See* DE 181-4 (text of POW Zoning Amendment).

_____

[12] Defendant also raises entirely nonsensical arguments, such as the claim that "plaintiffs' facial challenges to the POW Law are not ripe," DE 181-5 at 17, when, of course, facial challenges "are generally ripe the moment the challenged regulation or [law] is passed." *Lubavitch I*, 2021 WL 4472852, at *11 (citations omitted).  Other assertions made by defendant, such as the claim that the Court should upend the determinations by Judge Hurley "in light of . . . documentary evidence [purportedly demonstrating] that the POW Law did not have a discriminatory intent or impact," DE 181-5 at 18, suggests that counsel fails to comprehend the meaning of a "facial" challenge.

[13] This, sadly, is not the only misleading argument raised by defendant here.  For example, in connection with plaintiffs' freedom of association claim, counsel boldly asserts that "Plaintiffs' claim for violation of the right to freedom of association fails because they do not allege facts demonstrating direct and substantial interference with associational rights. [ ] Plaintiffs are still able to associate in connection with their religious activities."  DE 181-5 at 23.  Yet, annexed to the SAC is a letter from the Village advising Rabbi Konikov and his wife, who were going to hold a Torah dedication ceremony in their home, that such uses were prohibited as "the Village has not issued a permit for a religious use."  DE 110 at 141.  Furthermore, as defendant endeavors to distinguish *Congregational Rabbinical College of Tartikov v. Pomona*, 915 F.Supp.2d 574 (S.D.N.Y. 2013), defense counsel bizarrely asserts that "*Tartikov* involved a school. The free speech involved was educational, which required a school building for instruction and study."  DE 192 at 20.  So too, generally speaking, do religious ceremonies.

However, the comparison between the provisions applied to places of worship and private schools is solely a creation of the Board's action in formulating the POW Law—the Trustees could have, just as easily, created an amendment affecting the construction of religious edifices and, say, iron smelting facilities, which would have almost certainly created a favorable comparison.

The Village's action in enacting contemporaneous amendments affecting religious institutions and private schools does not limit the universe of analysis of a facial challenge, as the POW Law is part of a larger, coherent zoning code regulating land use. A review of that zoning code reveals that the Village imposes less onerous requisites on landowners who opt to develop land for residential purposes, *see* Old Westbury, N.Y., Code § 216-13, a distinction that might be justifiable given that private residential uses and more public uses of land can implicate different concerns. However, the Village Code also provides far more generous provisions for many types of non-residential, commercial and public development. The *Roman Catholic Diocese* case, accepting the apparently unchallenged assertions by defendants, found that the POW Law "treats places of worship better than many other secular institutional uses, such as theaters, recreational clubs, membership organizations, and entertainment venues, which are not permitted in the Village at all." *See Roman Cath. Diocese*, 128 F. Supp. 3d at 583 (citing "Def. Opp. at 11."). In fact, the Village's zoning code permits many types of non-residential development in its so-called "residential" zones and imposes seemingly more stringent requirements on religious uses than it does on professional offices, public schools, public utility facilities, farms, private and commercial horse stables,[14] and the Village's own "municipal uses and purposes," a few of which are described above. *See* Old Westbury, N.Y., Code §§ 216-11, -12; *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)

---

[14] Remarkably, facilities for the commercial training and boarding of horses—an endeavor not specifically protected by the U.S. Constitution—may include buildings of up to 35 feet in height, whereas places of worship are limited to 25 feet. *Compare* Old Westbury, N.Y., Code § 216-111, *with id.* § 216-111.2.

6

("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise").

*Roman Catholic Diocese* also holds that "the POW Law must be analyzed in the context of New York State public policy."  128 F. Supp. 3d at 582.  The decision suggests that "the enactment of the POW Law [ ] to ensure the development of these institutions in a manner consistent with the residential character of the Village and to mitigate the adverse impacts related to these institutional uses" was consistent with New York State public policy.  *See id.*  However, a state court considering the POW Law noted that "in New York[,] as a matter of public policy, religious uses of land are presumptively beneficial to the public."  *McGann v. Inc. Vill. of Old Westbury*, 186 Misc. 2d 661, 662, 719 N.Y.S.2d 803 (Nassau Cty. Sup. Ct. Nov 9, 2000) ("So strong is the presumption of public benefit that ordinarily such factors bearing on public health, safety and welfare as neighborhood appearances, adverse effect on property values, loss of tax revenue, decreased enjoyment of neighboring properties and traffic hazards are insufficient to rebut the presumption.") (citing *Diocese of Rochester v. Plan. Bd. of Town of Brighton*, 1 N.Y.2d 508, 525, 136 N.E.2d 827 (1956)).  Thus, it is difficult to reconcile the POW Law with state policy on the development of religious facilities.

Furthermore, in finding the POW Law facially neutral, *Roman Catholic Diocese* notes that "the POW Law does not apply exclusively to Plaintiff or the Roman Catholic religion, but applies equally to all religious institutions."  128 F. Supp. 3d at 581 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538–39 (1993)).  This determination was based on defendant's argument, again repeated here, that "the ordinances in *Lukumi* were non-neutral 'because their burden fell on "almost" no one but the disfavored religious group.'"  DE 192 at 16-

7

17 (quoting *Central Rabbinical Congress v. N.Y.C. Dept. of Health*, 763 F.3d 183, 196 (2d Cir. 2014)).  Yet defendant's selective quotations from *Lukumi* misstate the meaning of the case, in which the Court held that "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against *some or all* religious beliefs or regulates or *prohibits conduct because it is undertaken for religious reasons*."  *Lukumi*, 508 U.S. at 532 (emphasis added) (further noting "[t]hese principles, though not often at issue in our Free Exercise Clause cases, have played a role in some").  Moreover, as may not have been the case in *Roman Catholic Diocese*, the SAC makes specific allegations describing the Village's financial interest in discouraging and limiting development not only the development of plaintiffs' proposed facilities,[15] but of all religious institutions[16] due to the exemption of property from its tax base.

Based on the foregoing, this Court must agree with the determination by Judge Hurley and find that the plaintiffs have adequately alleged a facial challenge to the POW Law.  Therefore, the motion to dismiss must be denied in this respect.

*B. Ripeness and the As-Applied Challenges*

In *Lubavitch I*, Judge Hurley further explored the question of as-applied claims, finding that such claims, as alleged in the SAC, were unquestionably ripe.  "Many courts have noted that futility follows from 'considerable' delay," Judge Hurley observed.[17]  And over three years ago,

---

[15] *See, e.g.*, DE 110 at 230 (Draft Environmental Impact Statement stating "[t]he property tax exemption eliminates any net tax benefits associated with the proposed additions").

[16] *See, e.g.*, *id.* at 15 (providing examples of other religious institutions purportedly pressured by the Village to downsize projects and rezone portions as residential properties, make payments in lieu of taxes or abandon projects altogether); *id.* at 24 (describing steps "intended to discourage religious land use"); *id.* at 50 (alleging that "Defendants favor secular uses before any religious land uses"); *cf.* VHB Engineering, *Village of Old Westbury: Land Use and Zoning Study, June 2021* at 11, https://www.villageofoldwestbury.org/DocumentCenter/View/773/VOW-Land-Use-and-Zoning-Study-June-Update-PDF at 43 (describing the Village's religious institutions as "assets," yet concluding that "[r]esidents are experiencing increased pressure on property taxes for a variety of reasons, including . . . a large inventory of tax-exempt properties due to the conversion of larger properties to tax-exempt institutional uses").

[17] *Lubavitch I*, 2021 WL 4472852 at *13.

Judge Hurley determined that "[t]he twenty-year delay here, even attributing some portion thereof to Plaintiffs' conduct, easily clears the 'considerable' bar."[18]

On this motion, defendant attempts to reset the clock through the submission of several conclusory declarations with exhibits, which counsel claims establish that "[o]ver a three-year period, the Village timely carried its review and did not place any brick walls in Plaintiffs' path," and during that limited window the "process proceeded normally." DE 192 at 13, 16. The Village attempts to fit this Court with a set of judicial blinders, asserting that the undersigned should consider only this limited window, reject Judge Hurley's thoughtful analysis of this question and find that the plaintiffs' claims are not yet ripe. While the arguments raised here are spurious in several respects, perhaps the most audacious and revealing is that involving the history of this case: counsel for the Village rely upon the "critical" status reports filed in this case to "refute Plaintiff's claims of an on-going pattern of abuse, mistreatment and obstruction." *Id.* at 13. Defendant cannot reap a substantive benefit from the fact that a former presiding judge saw fit to place this action in "administrative hold"[19] for more than a decade; contrary to counsel's assertion, whatever proceeding occurred during this period was not "under the supervision of this Court without incident." *Id.* at 15.

---

[18] *Id.*

[19] While there appears to be little precedent for placing a case into "administrative hold," the concept seems most closely akin to "administratively closing" an action. *See, e.g.*, *In re Barkany*, 542 B.R. 662, 681 (Bankr. E.D.N.Y. 2015). Such a directive "functionally amount[s] to a stay of the proceedings," does not represent a "final decision or any other order that is appealable" and carries "no jurisdictional significance." *Zimmerman v. UBS AG*, 789 F. App'x 914, 915 (2d Cir. 2020). That hold was expressly imposed as part of a Stipulation and Order in 2009 providing that it would extend "while the Plaintiffs file a special use permit application for the development of the parcel located at 267 Glen Cove Road, Village of Old Westbury, New York and until a determination is made by the Board of Trustees for the Village of Old Westbury with respect thereof." DE 30. For defendant to now claim that the intervening period and the formulaic status reports filed represent some form of judicial oversight of its processes is preposterous.

The Court has examined the materials submitted by defendant.  Nothing contained therein warrants disturbing Judge Hurley's careful determination.  Thus, plaintiff's as-applied challenges are ripe and not subject to dismissal.

*The Remaining Counts and Challenges*

The parties, as noted, have raised other miscellaneous objections to the R&R; few are worthy of extended comment.  The Magistrate Judge correctly determined that the third claim fails to allege sufficient facts to warrant an "intimate association" claim but should otherwise proceed; plaintiffs' objection thereto is inapposite and therefore denied.

Defendant correctly notes that the Magistrate Judge's consideration of Count Four using a *sua sponte Pyke* analysis denied the parties a reasonable opportunity to contest this construct and therefore that portion of the R&R is rejected.  Count Four otherwise rests on a selective enforcement theory; not only have plaintiffs failed to allege comparators, but the SAC identifies religious-use landowners who were also allegedly subject to the same wrongful treatment.  Thus, Count Four is properly dismissed.

As to Count Nine, Magistrate Judge Dunst recommended dismissing much of this claim.  As plaintiffs filed no objection, and not finding any clear error, that portion of the R&R is adopted.  Defendant objects that the remaining portion of Count Nine—relating to direct retaliation arising from the efforts to develop the property for religious purposes—should also be dismissed, but the reasons provided are not cognizable at this juncture.  As such, the Court adopts the R&R in this respect, granting the motion to dismiss to the extent noted.  In sum, the Court will adopt the recommendations as set forth in Appendix A.

*The Path Forward*

The allegations raise serious issues of constitutional magnitude, and this matter has lingered far too long.  That ends now.  Counsel will be expected to work diligently to bring this matter to resolution—in whatever form that might occur—with all deliberate speed.

In this respect, plaintiffs' counsel included a rather extraordinary statement in its objections:

> Plaintiffs intend to replead Counts 9-12 in the SAC as to Defendants Carillo, Malatino, Baker, and Novick, as allowed at ECF 169, pages 36-37 and the Order dated March 23, 2023. They propose to do so after this motion, first filed in tandem with the individual defendants' since decided motion, is determined. Plaintiffs invite the Court's further direction, if any.

DE 193 at 2 n.1.  After fourteen years of litigation, and more than a year ago, Magistrate Judge Dunst issued an R&R, which recommended all individual claims against these individual defendants be dismissed.  *See* DE 169 at 34-37.  Notably, in making this recommendation, Magistrate Judge Dunst held that plaintiffs had "resort[ed] to group pleadings," failed to make any individual allegations against these defendants and had relied on "a tactic which is expressly disfavored with respect to Section 1983 proceedings."  *Id.*  Perhaps out of an abundance of caution, Magistrate Judge Dunst did not recommend a dismissal with prejudice as to these defendants (though he made such a recommendation with respect to many of plaintiffs' other improper claims against individual defendants).  These recommendations were adopted by the undersigned via Electronic Order dated March 23, 2023.  In the interim, plaintiffs' counsel made no mention of potential repleading until now, at which point counsel alludes to an intention to replead at an unspecified time in the future.

Under Fed. R. Civ. P. 15(a)(2), such an amendment is permissible only with leave of court and "when justice so requires."  While leave to amend is generally freely granted, such leave may

be denied where the movant acts with undue delay and where leave would unfairly prejudice an adverse party. *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 17-CV-2614 (WHP), 2020 WL 42245, at *1 (S.D.N.Y. 2020). Here, plaintiffs waited far too long to make the application. As to the prejudice to the individual defendants, the pendency of unjustified Section 1983 litigation against officials results in significant—and too often overlooked—hardships on those individuals. *Corso v. Cnty. of Suffolk*, No. CV 19-3189 (GRB), 2021 WL 972745, at *2 (E.D.N.Y. Mar. 16, 2021) (denying leave and collecting cases). Moreover, further delay and additional complication of these proceedings cannot possibly serve the interests of justice.

These factors, combined with the substantive deficiencies identified by Magistrate Judge Dunst counsel against granting leave to replead at this late date. Thus, leave to replead is denied.

Magistrate Judge Dunst stayed discovery in this matter pending the undersigned's review of the R&R. *See* Electronic Order dated December 21, 2023. For all the reasons stated, that stay is hereby lifted, and discovery should proceed forthwith.

And it will proceed quickly. Given the unthinkable amount of time (and money) already spent on this case and related litigation, along with the vast record already available to the parties, this matter will be returned to Judge Dunst to supervise discovery. The parties are directed to meet and confer to establish a discovery schedule that will conclude in no longer than nine months from the date of this Opinion. At that juncture, unless the matter is settled, the parties should be prepared to proceed with summary judgment or trial, as appropriate.

**SO ORDERED.**

Dated: Central Islip, New York
          February 16, 2024

                                                            /s/ Gary R. Brown
                                                            GARY R. BROWN
                                                            United States District Judge

## APPENDIX A

| Claim | Description | Recommended Disposition of Motion to Dismiss | Objection P | D[20] | Court's Ruling on the Motion |
|---|---|---|---|---|---|
| 1 | §1983 Free Exercise | Denied | | X | Denied |
| 2 | §1983 Free Speech/Association | Denied | | X | Denied |
| 3 | §1983 Freedom of Association | Denied in part; granted as to "intimate association claim" | X | X | Denied in part; Granted as to "intimate association claim" |
| 4 | §1983 Equal Protection | Granted as to dismissal of selective enforcement claim for lack of comparators, but survives as a *Pyke* claim. | | X | Granted: lack of comparator institutions |
| 5 | §1983 Due Process | Denied | | X | Denied |
| 6 | RLUIPA Substantial Burden | Denied | | X | Denied |
| 7 | RLUIPA Discrimination | Denied | | X | Denied |
| 8 | RLUIPA Land Use/Equal Terms | Granted: lack of comparator institutions | | | Granted: lack of comparator institutions |
| 9 | Retaliation/Constitutional Rights | Granted in part; denied as to retaliation for pursuing right to use property for religious purposes | | X | Granted in part; Denied as to retaliation for pursuing right to use for religious purposes[21] |
| 10 | Fourth Amendment Search (various incidents) | Granted:  failure to satisfy *Monell* pleading requisites. | | | Granted: failure to satisfy *Monell* pleading requisites |
| 11 | | | | | |
| 12 | | | | | |
| 13 | "Commingled Claim"[22] | Granted: Claim abandoned | | | Granted: claim abandoned |
| 14 | §1985 Civil Conspiracy | Granted (with prejudice): single defendant/absence of conspiracy. | | X | Granted (with prejudice): single defendant/absence of conspiracy. |
| 15 | §1986 Failure to Prevent Interference | | | X | |
| 16 | NYS Constitutional Claims | Granted: Claims withdrawn | | X | Granted: Claims withdrawn |
| 17 | Discrimination/NY Civil Rights law | | | | |

[20] Defendant filed certain specific objections, each of which is designated with an X.  In addition, defendant filed generalized "theory based" objects (including objections based on the R&R's analysis of law of the case, ripeness, etc.) which—to the extent their applicability are expressed—are designated by a grayed X on the chart.  These generalized objections fail to satisfy the requisites of the statute and, somewhat outrageously, encompass objections to counts as to which defendant prevailed before the Magistrate Judge, including Claims 14 and 15.

[21] To be clear, this appears to include retaliation regarding to the development and use of the Mikvah.  To the extent defendant claims that denial of such development and use was the result of actions by the Fire Marshal, such arguments will be considered at summary judgment or trial.

[22] DE 188 at 31.