FILED
CLERK

10/30/2025 1:48 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
LUBAVITCH OF OLD WESTBURY, INC.
and RABBI AARON KONIKOV,

                            Plaintiffs,         **MEMORANDUM OF LAW
                                                       AND ORDER**

           -against-                              08-CV-5081(GRB)(LGD)

INCORPORATED VILLAGE OF OLD
WESTBURY, NEW YORK,

                            Defendant.
-------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

> *Under defendant's zoning code, "a pit of manure may be located closer to the property line than a place of worship."*
>
>                                                   -*An undisputed fact found at DE 250-1 ¶ 88.*

Plaintiffs, a Lubavitch religious organization and its rabbi, seek to build a Chabad on land located in the Village of Old Westbury. They allege that the Village has thwarted that effort chiefly through the adoption of a land use statute aimed at places of worship. In a case that is rapidly approaching its second decade of pendency, and represents the oldest matter on this Court's docket, defendants now seek summary judgment as to all claims, and plaintiffs seek partial summary judgment. Much of the motion practice blithely ignores the relevant, if not dispositive, litigative history of this action, eliding determinations made by this Court.

Nearly two years ago, this Court affirmed a Report and Recommendation describing "the unacceptably long history of this case," noting that review of this "woeful tale makes it plain that this matter must be moved forward with deliberate speed." *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York*, No. 08-CV-5081 (GRB) (LGD), 2024 WL 656516, at *2

1

(E.D.N.Y. Feb. 16, 2024) ("*Lubavitch II*"). In that decision, the Court noted that the thorough, thoughtful decision of Judge Hurley, rendered several years earlier, proved dispositive of many of the issues raised at that time. *Id.* (citing *Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York,* No. 08-CV-5081 (DRH) (ARL), 2021 WL 4472852 (E.D.N.Y. Sept. 30, 2021) ("*Lubavitch I*")). Following a lengthy period of discovery, launched more than a year ago, plaintiffs Lubavitch of Old Westbury, Inc. and Rabbi Aaron Konikov and defendant Incorporated Village of Old Westbury ("the Village") cross-moved for summary judgment as to various claims.

Despite voluminous filings, plaintiffs' motion for partial summary judgment as to its facial challenge to the Village's Places of Worship ("POW") Law as a deprivation of their right to the Free Exercise of religion, DE 110 at 98-99, proves the only meritorious motion now before the Court. The determinations made in *Lubavitch I* and *Lubavitch II*, incorporated herein by reference, resolve many of the issues raised here. For example, *Lubavitch II* held "that this Court must agree with the determination by Judge Hurley [in *Lubavitch I*] and find that the plaintiffs have adequately alleged a facial challenge to the POW Law." *Lubavitch II*, 2024 WL 656516, at *4.

Discovery has been completed and nothing has materially changed. In 2024, this Court found that, compared to the religious uses specified in the POW Law, "the Village imposes less onerous requisites on landowners who opt to develop land for residential purposes" and "provides far more generous provisions for many types of non-residential, commercial and public development." *Lubavitch II*, 2024 WL 656516, at *3. On a full summary judgment record, the case for the facial infirmity of the POW Law has been strengthened. As detailed herein, the record now available demonstrates many more ways in which the POW Law treats

2

religious development less favorably than comparable secular land uses. Thus, the Court grants plaintiffs' motion, denies defendant's motion, and declares the POW Law facially invalid under the United States Constitution.

**<u>Factual Background</u>**

*Undisputed Facts as to the Plaintiffs' Motion*

In support of their motion, plaintiffs assert many facts, which are either undisputed, or improperly disputed by defendant. The relevant facts fall into two categories: those demonstrating that the provisions of the POW Law "treat any comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), and others which bear on the legitimacy of the Village's asserted interests in enforcing this law, including facts suggesting that the law was drafted to codify the Village's resistance to the exercise of religious freedoms.

Since 2007, or before, plaintiffs, who own more than nine acres of property in the Village, have endeavored to develop a temple for assembly and worship. Defendant's Counterstatement to Plaintiffs' 56.1 Statement, DE 250-1 ¶¶ 10-11. The property, previously the site of a commercial nursery, is located on Glen Cove Road, upon which 32,000 vehicles travel on an average workday. *Id.* ¶ 15. It is across the street from a New York State Department of Transportation equipment transfer and maintenance yard, which stores heavy machinery including dump trucks, salting trucks, snowplows, front loaders and cherry pickers. *Id.* ¶¶ 19-20.

On March 19, 2001, the Village enacted Local Law No. 4, which repealed the prior law and adopted the POW Law at § 216-111.2 of the Zoning Code. *Id.* ¶¶ 50-51. The POW Law divested the Board of Zoning Appeals of jurisdiction pertaining to religious land use applications and vested it with the Village Board of Trustees. *Id.* ¶ 52. The express purpose of the POW Law

3

was, at least in part, to "maintain the existing character of the Village of Old Westbury as a low density, residential community." *Id.* ¶ 53. Additionally, the non-residential uses governed by the POW Law concern projects which, if completed, would not pay property taxes to the defendant Village, an issue that has been the subject of concerns expressed by some of its leaders. *Id.* ¶ 57 (citing Ex. T5 (Carillo Tr.) at 301:25 – 302:5 ("We represent the residents.")).

The Village issued findings with the statute that included the following:

> Revised special permit standards for institutional uses such as houses of worship and schools will help to preserve the Village's low density residential character. In addition, the existing standards will be enhanced to mitigate potential land use compatibility impacts of institutional uses with residential neighborhoods. The proposed zoning text amendments include new standards to address aesthetic, traffic, community service and other impacts associated with increased levels of activity related to institutional uses. . . .The proposed zoning text amendments . . . would also help to preserve the Village's estate character by encouraging the preservation of existing mansions and their surrounding estate areas. . . .
>
> The size of some institutional facilities and their associated levels of on-site activity can have significant adverse impacts on established residential areas, especially in relation to visual and aesthetic character. Locating not-for-profit schools and places of worship in appropriate places will help them to function better and, at the same time, minimize their potential impacts on tranquil residential areas.

*Id.* ¶ 58. The then-mayor announced that the POW Law would "regulate the growth in the Village to minimize the impact on people who live here" and "maintain the quality of life as we have it here." *Id.* ¶ 59. That same former mayor testified:

> We have attempted over the last forty years, since I have lived in the Village, to maintain the Village in a similar manner that has been from the time that it was incorporated back in 1929; a rural area of private homes and ninety-eight percent of the property or ninety-five percent of the property is in private homes hands and whenever a piece of property gets developed, it normally is for home use not for a commercial use.

*Id.* ¶ 60. While defense counsel has not relied heavily on the Village's "aesthetic" interests, it does invoke controlling interests in "traffic, parking, noise [and] crowds," but these legislative findings and statements seem removed from reality. As visually demonstrated in the amended complaint,

4

the Lubavitch site is situated across from a state government heavy machinery yard and is a stone's throw away from the Northern State Parkway and the infamous Long Island Expressway, the area's busiest roadway that, at times, becomes the most congested traffic artery in the nation:[1]



DE 110 ¶ 8. The location of the site, and its proximity to major highway interchanges and construction storage yards, belies claims relating to the "visual and aesthetic character" of the area.

The POW Law classifies places of worship as a "special exception" permitted only in the B, BB, and B-4 Residence Districts, upon approval by the Board. *Id.* ¶ 71. Places of worship are also subject to various restrictions:

---

[1] https://www.nbcnewyork.com/news/local/this-ny-highway-became-americas-busiest-stretch-of-road-for-a-few-hours-on-wednesday/3419406/

5

*Minimum Lot Size*

The Zoning Code requires that places of worship have a minimum lot area of 12 acres. *Id.* ¶ 74. This provision compares unfavorably with the minimum requirements required for other property development and uses, including livestock farms (10 acres), stables, barns and sheds for sheltering horses (one to four acres) and commercial establishments (one acre). *Id.* ¶¶ 74-77.

*Reserved Natural Land, Maximum Lot Coverage, Building Area/Volume and Parking*

The POW Law requires that places of worship maintain at least 35% of their 12 acres of lot area, and 50% of any lot area in excess thereof, in a natural, undeveloped state. *Id.* ¶ 78. The law makes no such provision for other uses of property in the same residence districts. *Id.* ¶ 79. Properties developed for residential use are subject to a maximum lot coverage of 25%, while the POW Law limits places of worship to maximum lot coverage of 20% for the first 12 acres of the total lot area and 15% of additional lot areas. *Id.* ¶ 80. Residential development may include a maximum building area of between six to ten percent of the lot area; the POW law limits religious establishments to a maximum area of four percent of the first 12 acres and three percent beyond that. *Id.* ¶ 81. Relatedly, the POW Law offers a maximum permitted building volume for places of worship, as compared to the amount of land owned, of approximately half of what is allowed for certain secular establishments. *Id.* ¶ 90. Moreover, the POW Law requires substantially greater parking areas for religious developments as compared to secular developments. *Id.* ¶¶ 91-95.

*Locations and Frontage*

The POW law limits construction of religious facilities to one of four roadways in the Village and requires that such facilities have at least 200 feet of street frontage along one of the roadways. *Id.* ¶¶ 82-83. With the sole exception of not-for-profit schools, which are also subject

6

to the POW law, other types of property uses are not restricted to those roadways, and are subject to minimum frontage requirements, depending on the district, of 25, 140 or 200 feet. *Id.* ¶ 84.

*Minimum Yard Setbacks*

The POW law subjects religious institutions to minimum yard setbacks that are substantially more burdensome than those for non-religious uses, as set forth in the table below:

| District | Zoning Code | Minimum Yard Setback |
|---|---|---|
| B Residence | § 216-29(A)(2) | 40 feet (front)<br><br>25 feet (side)<br><br>50 feet (rear) |
| BB Residence | § 216-17(A)(1) | 75 feet (front)<br><br>50 feet (side)<br><br>50 feet (rear) |
| POW Law | § 216-111.2(D) | 200 feet (front)<br><br>125 feet (side)<br><br>125 feet (rear) |

*Id.* ¶ 86. Commercial establishments developed in the Business A district are subject to a setback of only 25 feet. *Id.* ¶ 87. As a result of such differential treatment, it is undisputed that "[i]n the B and BB Residence Districts, a pit of manure may be located closer to the property line than a place of worship." *Id.* ¶ 88.

7

*Maximum Building Height*

The POW Law limits the maximum building height of a place of worship to 25 feet. *Id.* ¶ 89. Meanwhile, the zoning restrictions appear far more generous toward other types of development, with principal residences, private golf clubs and commercial horse stables allocated maxima of 35 feet, plus accessory buildings of 20 to 25 feet. *Id.* The only buildings subject to a less generous height limitation identified by the Village are restaurants, which are restricted to a maximum height of 20 feet. *Id.* ¶ 89.

The building height restriction gives rise to a curious factual issue. Throughout its filings, the Village invokes the recommendations of Frederick P. Clark Associates ("Clark Associates"), a consulting firm upon which it allegedly relied to draft the subject statute. DE 250 at 23 (describing the company as "the Village's land use planner"). Clark Associates drafted two documents: a "Draft Generic Environmental Impact Statement ("DGEIS") to address the reasons for, and effects of, the proposed amendments," and "a Final Generic Environmental Impact Statement ("FGEIS") [which] included responses to public comments at the hearing concerning the purpose and reasons for the recommended amendments." DE 248-1 at 11 (citing Ex. 5 to Carillo Aff). An individual named David Portman principally drafted these documents, DE 249-31 at 5, and is described—apparently without significant objection—as "the principal drafter of the POW Law and the Village's chief land use planner for 19 years at the time of its adoption." DE 250-1, ¶ 111. Portman provided crucial testimony in connection with the height restriction contained in the POW law:

> There's what I consider somewhat of an anomaly in the Village's code, historically, because residences are permitted a 35-foot maximum height, and non-residential uses are permitted a 25-foot height. And one of the things that, you know, in terms of making this more accommodating to schools and places of worship, I recommended that the permitted height for non-residential uses go to either 35 or 45 feet. I forget which I recommended. There was a draft with that. The Village

8

> board determined that it should remain at 25 feet, and then they would use their flexibility to increase it and would give them greater leverage, authority with respect to these uses to allow them to go to a greater height, maybe, in exchange for greater screening or increased setback or something like that.
>
> So they wanted to keep it at 25 feet. So [ ] they didn't follow our recommendation down the line.

DE 249-31 at 10. Relatedly, a former mayor described the POW Law as a negotiating weapon wielded against religious groups. DE 250-1, ¶ 113 ("We've made deals with other religious organizations and it's in negotiation. Try to get what you can. You can't, you can't.").

Defendant does not dispute that Portman so testified. Rather, counsel for defendant attempts to conjure an argument from the ether suggesting that Portman's testimony is inadmissible under Federal Rule of Evidence ("Fed. R. Evid.") 804(b), consistently mis-cited by defense counsel as part of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[2] This argument rests on the specious claim that while such testimony might be admissible for the purposes of the instant motions if Portman was unavailable, plaintiffs have not made the requisite showing. DE 250 at 23 (arguing plaintiffs cannot rely on Portman's "possible (yet unproven) unavailability."). Yet, it is undisputed that Mr. Portman, an 86-year-old Florida resident, has been suffering from progressing Parkinson's Disease for more than a decade. DE 250-1 ¶ 115. In a related action in 2016, the Village represented to another federal judge in this district that travelling to New York for trial would, according to his doctors, be detrimental for Mr. Portman, and sought leave to obtain trial testimony from Portman in Florida. *Id.* ¶¶ 118-19.

The Village's argument ignores the evidentiary standard applicable to a motion for summary judgment. Both sides here seek summary judgment, which necessarily requires assessment of undisputed or indisputable facts without trial. Thus, by definition, evidence relied

---

[2] *See* DE 250 at pp. 7 and 23.

on – deposition transcripts, documents, declarations and the like – frequently represent some form of hearsay, as in each instance, the materials constitute "statement(s) that the declarant does not make while testifying at the current trial or hearing." Fed. R. Evid. 801(c)(1). Thus, as the Second Circuit has repeatedly held, "[m]aterials submitted in support of or in opposition to a motion for summary judgment 'must be admissible themselves *or must contain evidence that will be presented in admissible form at trial.*'" *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014) (emphasis added)[3] (quoting *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.")). Indeed, Rule 56 explicitly provides that "[a] party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*." Fed. R. Civ. P. 56(c). Applying this principle, in *Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 181 n.6 (2d Cir. 2022), the Second Circuit ruled that the fact that a movant for summary judgment "must lay the proper foundation at trial to admit the content of [a] form under Federal Rule of Evidence 703 [ ] does not make it inadmissible hearsay."

Thus, the Court's role at this juncture is to "determine the likely admissibility of the hearsay evidence offered by a party." *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020) (internal quotation omitted). Here, notwithstanding counsel's ill-considered sophistry, the record shows that an offer of Portman's deposition testimony overcomes the defendant's hearsay objection. First, such testimony appears admissible under the provisions of Fed. R. Civ. P. 32(a)(8). Even adopting defendant's

---

[3] Remarkably, *Delaney*, which *undermines* defendant's position, is the only case citation offered in support of its misleading argument. DE 250 at 23.

unavailability analysis, its seems that Portman likely would be unavailable due to medical conditions or simply due to his distance from the Courthouse, rendering his deposition testimony admissible. In the unlikely event that he was available, he could testify to the material contained in his deposition. Other avenues, including the possibility of testifying via Zoom, also lead to likely admissibility. Thus, to the extent relevant, Portman's testimony may be considered on this motion.[4]

*Discussion*

As the Second Circuit recently reaffirmed:

> The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S. Ct. 900, 84 L.Ed. 1213 (1940) (incorporating the Free Exercise Clause against the states). It is well established that discrimination against religion is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer,* ––– U.S. –––, 137 S. Ct. 2012, 2025, 198 L.Ed.2d 551 (2017).
>
> The Free Exercise Clause protects both an individual's private right to religious belief and "the performance of (or abstention from) physical acts that constitute the free exercise of religion," including "'assembling with others for a worship service.'" *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 108 L.Ed.2d 876 (1990)). This protection "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability," *Smith*, 494 U.S. at 879, 110 S. Ct. 1595 (internal quotation marks omitted), and such a neutral and generally applicable policy is subject to only rational-basis review, *Cent. Rabbinical Cong.,* 763 F.3d at 193. Official action "burdening religious conduct that is not both neutral and generally applicable, however, is subject to strict scrutiny." *Id.*

---

[4] On this record, defendant's argument goes beyond unmeritorious, straying into the realm of improper and obstructive. For example, counsel's assertion that the Carrillo testimony that "Mr. Portman is the expert" and "[w]hatever he says goes," seems "unrelated" to the Village's override of its expert's opinion to gain leverage in negotiations with religious organizations, DE 250-1, ¶ 112, stands as a monument to disingenuity.

11

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). The Supreme Court has clarified, however, that:

> government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ——, —— – ——, 141 S. Ct. 63, 67-68, 208 L.Ed.2d 206 (2020) (per curiam). It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue. *Id.,* at —— – ——, 141 S. Ct., at 66-67 (Kavanaugh, J., concurring).

*Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Plaintiffs' motion is limited to a facial challenge to the POW Law. As Judge Hurley observed, "a facial challenge to a law or ordinance considers only the text of the law or ordinance itself, not its application to the particular circumstances of an individual." *Lubavitch I*, 2021 WL 4472852, at *11 (cleaned up).

Defendant quarrels about whether the other preferred uses discussed above – including residential developments, private golf clubs, commercial establishments, restaurants, commercial horse stables and livestock farms – are comparable for making this determination. The Supreme Court has held that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," adding "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather." *Tandon,* 593 U.S. at 62. Here, the Village cites a laundry list of interests, many without explication, including "traffic, parking, noise, crowds and effect on water and sewage services." DE 248-1 at 24. Little evidence is offered by the Village concerning the nature of the risks to these generalized (and largely uncompelling) interests posed by the varying uses. For example, farms and commercial horse stables may pose equal if not far greater risks to water and sewage services than religious buildings. Traffic, parking, noise and crowd issues created by restaurants and commercial establishments certainly seem comparable to those

12

presented by houses of worship. And yet, in nearly every instance, religious institutions are treated less favorably under the statute.

As the POW Law cannot be said to be a "neutral law of general applicability," strict scrutiny review shifts the burden to the defendant "to show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied," and "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest(s)." *Tandon*, 593 U.S. at 63. Here, the Village does not, as it really cannot, make any such showing.[5] For example, the discriminatory height restriction placed on religious structures, which is less favorable than nearly any other land use permitted by the Village, is presented without legitimate justification. The record is replete with other examples: there is no proffered rationale, nor can one reasonably be imagined, that explains the Village's requirement that a restaurant have one parking space for every three customers, while a religious assembly need provide one space for every two congregants. And the differential treatment of religious institutions in such matters as minimum acreage, setbacks, reserved land, frontage and building area seem unrelated to any legitimate interest proffered by the Village and certainly fail a narrow tailoring analysis.

The undisputed and indisputable facts render it beyond doubt that the POW Law treats comparable secular activities more favorably than religious exercise, and thus its restrictions trigger strict scrutiny. *Id.* Despite the inclusion of private schools in the legislation, and the Village's references to land uses that are prohibited by its zoning code, such arguments fail, as the Village undeniably "treats some comparable secular businesses or other activities as poorly

---

[5] Defendant is not alone in this regard. One scholar identified fifteen efforts to satisfy strict scrutiny, and all failed. Adam Winkler, Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts, 59 *Vanderbilt Law Review* 793, 861-62 (2006).

13

as or even less favorably than the religious exercise at issue," and cannot avoid strict scrutiny review. *Id.*; *see Lubavitch II,* 2024 WL 656516, at *3 ("the Trustees could have, just as easily, created an amendment affecting the construction of religious edifices and, say, iron smelting facilities, which would have almost certainly created a favorable comparison.").

      Remarkably, counsel for defendant shamelessly asserts that the POW Law was subject to "an independent assessment [ ] by the District Court [which found it] was a neutral and generally applicable law and constitutional [and] did not proscribe more religious conduct than necessary." DE 250 at 27. Counsel's only support for this extraordinary proposition is a citation to *Roman Catholic Diocese of Rockville Center v. Incorporated Village of Old Westbury,* 128 F. Supp. 3d 566 (E.D.N.Y. 2015), a case cited throughout defendant's papers. This argument ignores, as though it did not exist, the lengthy analysis in *Lubavitch II* distinguishing the *Diocese of Rockville Center* decision and holding it inapplicable to this action. 2024 WL 656516, at *3–4. [6] Moreover, as noted in *Lubavitch II*, intervening law in this area raises additional questions about the continuing viability of the *Diocese of Rockville Center* decision. *Compare Tandon,* 593 U.S. at 62 ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise") *with Diocese of Rockville Center*, 128 F. Supp. 3d at 581 ("the POW Law does not apply exclusively to Plaintiff or the Roman Catholic religion, but applies equally to all religious institutions.").

      In considering the Village's showing in connection with a strict scrutiny review, the only evidence the defendant relies upon is the review conducted by Clark Associates. *See, e.g.,* DE

---

[6] That counsel packs some of this argument into a footnote does not mean that it would go unnoticed. DE 250 at 27, n. 23.

14

248-1 at 19-20, (quoting Statement of Christian Miller (claiming the purpose of study was "to deal with the issue of the recent proliferation of institutional development applications in the Village")); *id.* at 20 (representing that "the 12-acre minimum and 20% coverage area for places of worship were based on studies conducted by Clark."). Yet, the Clark study offers the Village no refuge given that the Portman testimony reveals instances in which the Village opted to ignore Clark Associates' recommendations without legitimate reason. Disgracefully, the indisputable evidence demonstrates that the Village opted to disregard the recommendations concerning building height to gain leverage in negotiations with religious organizations.

In short, the POW law adopted by the Village of Old Westbury unconstitutionally discriminates against the free exercise of religion and is therefore facially invalid. As the Court finds the statute facially invalid on these grounds, it need not reach plaintiffs' remaining facial claims.

*Defendant's Motion for Summary Judgment*

Given the irresponsible and misleading arguments lodged by defense counsel in its filings, which border on contumacious, the Court considered striking the defendant's motion. However, considering the seeming interminability of this case, the motion will be resolved if only to avoid further delay. Furthermore, despite weighty submissions, defendant's motion can be easily dispatched.

First, the Village argues that plaintiffs lack standing to bring the subject land-use claims, principally pointing to flaws in the application efforts made by plaintiffs. This argument, however, was explored and rejected as part of Judge Hurley's review of the larger ripeness issue. *Lubavitch I*, 2021 WL 4472852, at *11, (citing *Charette v. Town of Oyster Bay,* 159 F.3d 749, 757 (2d Cir. 1998) ("Charette ha[s] made no effort to apply for a permit for the Raven's Nest,"

15

which "does not, of course, deprive him of standing to assert that the Code is facially invalid.")). The defendant's argument is predicated solely on the plaintiffs' failure to present "not only an application but <u>a denial</u> . . . to demonstrate that the injury is not conjectural." DE 248-1 at 5 (emphasis in original). Yet Judge Hurley directly rejected this line of argument, a decision which defendant continues to flout. *Lubavitch I*, 2021 WL 4472852, at *15 ("under the circumstances alleged, a final decision is not necessary to evaluate the saga of Plaintiffs' land-use application.").

Second, the Village argues that the POW Law is not facially invalid. It is, as fully discussed above.

Third, the Village asserts that it is entitled to summary judgment as to plaintiffs' as-applied claims. On this issue, Judge Hurley held years ago that "the land-use procedures [p]laintiffs have endured are not just merely frustrating but unfair and unreasonable." *Lubavitch I*, 2021 WL 4472852, at *13. At this juncture, plaintiffs have set forth sufficient material issues of fact that overcome defendant's summary judgment motion.

Thus, defendant's motion for summary judgment is denied in its entirety.

***Conclusion***

It has been almost seventeen years since this matter was filed. In its last major decision in this case, this Court declared as follows:

> The allegations raise serious issues of constitutional magnitude, and this matter has lingered far too long. That ends now. Counsel will be expected to work diligently to bring this matter to resolution—in whatever form that might occur—with all deliberate speed. [ ]
>
> Given the unthinkable amount of time (and money) already spent on this case and related litigation, along with the vast record already available to the parties, this matter will be returned to Judge Dunst to supervise discovery. The parties are directed to meet and confer to establish a discovery schedule that will conclude in no longer than nine months from the date of this Opinion. At that juncture, unless

the matter is settled, the parties should be prepared to proceed with summary judgment or trial, as appropriate.

*Lubavitch II,* 2024 WL 656516, at *6.  Two more years of litigation, and the matter remains at this unsatisfactory juncture: the Court has now determined that the Village enacted a discriminatory law in violation of the United States Constitution.  Plaintiffs still have been unable to construct their Chabad.  Still more legal battles, costs and delays lie ahead.[7]

It would behoove all involved to work together to reach a satisfactory resolution of this matter.  Given its history, the undersigned cannot reasonably hold out much hope.  As such, this matter will be set for a conference on December 3, 2025 at 10:00 a.m.  Parties and their representatives will be required to attend.  At that conference, a trial date will be set.

No adjournments will be granted.

SO ORDERED.

Dated: Central Islip, New York
      October 30, 2025

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge

---

[7] These difficult determinations may include a review of plaintiffs' claims for damages. While plaintiffs' expert report was not presented to this Court on this motion, other submissions suggests that there may be highly contestable calculations contained therein.  In a summary presented by plaintiffs as to issues to be presented to the jury, counsel represents that "from 1999 to 2020 [plaintiffs] lost more than $15 million in pledged donor commitments," while "Rabbi Konikov's lost earnings and benefits . . . exceed $5 million."  DE 251-1.  As these figures include a time frame that predates the filing of litigation by nearly a decade, may well include speculative matters and, at a high level, would suggest double-counting, it is clear that, should the litigation proceed to that stage, the risks and costs will be substantial.